IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA – HARRISONBURG DIVISION

|  |  |
|---|---|
| _____ ) | |
| WTGD 105.1 FM, WQPO 100.7 FM, ) | |
| WJDV 96.1 FM, and M. BELMONT ) | |
| VERSTANDIG INC., d/b/a VerStandig ) | |
| Broadcasting, ) | Case No. 5:14cv00015 |
| ) | |
| Plaintiffs, ) | Hon. Michael F. Urbanski |
| ) | |
| v. ) | |
| ) | |
| SOUNDEXCHANGE, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT SOUNDEXCHANGE, INC.'S MOTION TO DISMISS

D. Stan Barnhill
Virginia Bar Number: 22978
WOODS ROGERS PLC
P.O. Box 14125
Roanoke, VA 24038-4125
Tel: (540) 983-7667
Fax: (540) 983-7711
barnhill@woodsrogers.com

Michael B. DeSanctis
*pro hac vice* application pending
Emily L. Chapuis
*pro hac vice* application pending
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, D.C. 20001
Tel: (202) 639-6323
Fax: (202) 661-4828
mdesanctis@jenner.com
echapuis@jenner.com

*Counsel for Defendant SoundExchange, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

    I.       The Statutory and Regulatory Framework ............................................... 3

    II.      SoundExchange .......................................................................................... 4

    III.    SoundExchange's History with Plaintiffs .................................................. 5

ARGUMENT ...................................................................................................................... 6

    I.       This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Declaratory Judgment Action .................................................................... 6

        A.      The Declaration Sought by Plaintiffs Would Be An Impermissible Advisory Opinion Under A Hypothetical State of Facts. ........................... 8

        B.      The Exchange of Letters Does Not Create a Real and Immediate Controversy Between the Parties. .......................................................... 11

    II.      SoundExchange Is Not Subject To Personal Jurisdiction in Virginia. ................. 13

        A.      SoundExchange Is Not Subject to Specific Personal Jurisdiction in This Court. .......................................................................................... 14

        B.      This Court Lacks General Jurisdiction ..................................................... 19

    III.    Plaintiffs Fail to State a Claim For Which Relief Can Be Granted. ..................... 21

        A.      The Court Should Defer to the United States Copyright Office's Interpretation of the § 114(d)(1)(B)(i) of the Copyright Act. ................... 22

        B.      The Copyright Office Is Correct that § 114(d)(1)(B)(i) Does Not Apply to Transmissions Over the Internet. ............................................. 25

CONCLUSION .................................................................................................................. 29

# TABLE OF AUTHORITIES

**CASES**

*3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372 (Fed. Cir. 2012) ................................................. 13

*Aetna Life Insurance Co. of Hartford v. Haworth*, 300 U.S. 227 (1937) ........................................ 7

*Alpharma, Inc. v. Purdue Pharma L.P.*, 634 F. Supp. 2d 626 (W.D. Va. 2009) .................. 8, 9, 10

*ALS Scan, Inc. v. Digital Service Consultants, Inc.*, 293 F.3d 707 (4th Cir. 2002) ................ 18, 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 22

*Baker v. Patterson Medical Supply, Inc.*, No. 11 CV 37, 2011 WL 7153948 (E.D. Va. Nov. 17, 2011), *report and recommendation adopted by*, 2012 WL 280109 (E.D. Va. Feb. 6, 2012) ................................................................................................................. 20-21

*Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208 (4th Cir. 2002) ............................................................................................................. 14

*Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761 (4th Cir. 2003) ........................................ 22

*Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939 (D.C. Cir. 2005) ........................... 25

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 22

*Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007) .................................. 8

*Bonneville International Corp. v. Peters*, 153 F. Supp. 2d 763 (E.D. Pa. 2001), *aff'd on other grounds*, 347 F.3d 485 (3d Cir. 2003) ................................................................ 24, 25, 28

*Bonneville International Corp. v. Peters*, 347 F.3d 485 (3d Cir. 2003) ................................... 22, 23

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .......................................................... 14, 17

*Cablevision System Development Co. v. Motion Picture Ass'n of America, Inc.*, 836 F.2d 599 (D.C. Cir. 1988) ................................................................................................... 25, 28

*Calder v. Jones*, 465 U.S. 783 (1984) ......................................................................................... 21

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390 (4th Cir. 2003) ........................................................................................................................... 20

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871 (Fed. Cir. 2008) ................................................ 8

*CFA Institute v. Institute of Chartered Financial Analysts of India*, 551 F.3d 285 (4th Cir. 2009) ............................................................................................................... 14, 17, 19

*Chiaphua Components Ltd. v. West Bend Co.*, 95 F. Supp. 2d 505 (E.D. Va. 2000) ................... 21

*Chung v. NANA Development Corp.*, 783 F.2d 1124 (4th Cir. 1986) .......................... 16

*Combs v. Bakker*, 886 F.2d 673 (4th Cir. 1989) ............................................................. 14

*Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273 (4th Cir. 2009) ..................... 15, 18

*Database America, Inc. v. Bellsouth Advertising & Publishing Corp.,* 825 F. Supp. 1195 (D.N.J. 1993) ............................................................................................................ 16

*Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Care Partners*, 229 F.3d 448 (4th Cir. 2000) .................................................................................................. 17-18

*Eagle Paper International, Inc. v. Expolink, Ltd.*, No. 2:07cv160, 2008 WL 170506 (E.D. Va. Jan. 17, 2008) .................................................................................................. 18

*ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997) ................................... 14-15, 19

*Geospan Corp. v. Pictometry International Corp.*, 598 F. Supp. 2d 968 (D. Minn. 2008) .......... 11

*Hanes Companies, Inc. v. Galvin Brothers, Inc.*, No. 09 CV 918, 2013 WL 594013 (M.D.N.C. Feb. 15, 2013), *report and recommendation adopted by*, 2013 WL 941791 (M.D.N.C. Mar. 11, 2013) .......................................................................................... 17

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ........................... 18, 19

*Hewlett-Packard Co. v. Acceleron, LLC*, 587 F.3d 1358 (Fed. Cir. 2009) .......................... 11

*IMS Health, Inc. v. Vality Technology, Inc.*, 59 F. Supp. 2d 454 (E.D. Pa. 1999) ................... 8

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377 (Fed. Cir. 2010) ............ 11

*International Harvester Co. v. Deere & Co.*, 623 F.2d 1207 (7th Cir. 1980) ......................... 9, 10

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ........................................... 14

*Intercollegiate Broadcast System, Inc. v. Copyright Royalty Board*, 574 F.3d 748 (D.C. Cir. 2009) .............................................................................................................. 27

*Invue Security Products, Inc. v. Merchandising Technologies, Inc.*, No. 12 CV 88, 2012 U.S. Dist. LEXIS 92097 (W.D.N.C. July 3, 2012) ................................................... 11

*Labram v. Havel*, 43 F.3d 918 (4th Cir. 1995) ............................................................. 22

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................................... 12

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ............................................. 7

*Miller v. Augusta Mutual Insurance Co.*, 157 F. App'x 632 (4th Cir. 2005) ................................7

*Mitrano v. Hawes*, 377 F.3d 402 (4th Cir. 2004)........................................................................18

*Modern Computer Corp. v. Ma*, 862 F. Supp. 938 (E.D.N.Y. 1994) ...........................................16

*Mylan Laboratories, Inc. v. Akzo, N.V.*, 2 F.3d 56 (4th Cir. 1993).............................................14

*Nichols v. G.D. Searle & Co.*, 991 F.2d 1195 (4th Cir. 1993)......................................................19

*Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010) ..................................................................7

*Prasco, LLC v. Medicis Pharmaceuticals Corp.*, 537 F.3d 1329 (Fed. Cir. 2008) ......................12

*Richmond Medical Center For Women v. Herring*, 570 F.3d 165 (4th Cir. 2009)........................7

*Satellite Broadcasting & Communications Ass'n of America v. Oman*, 17 F.3d 344 (11th Cir. 1994) ...................................................................................................................25, 28

*Super Products Corp. v. D P Way Corp.*, 546 F.2d 748 (1976) .....................................................9

*Tasini v. New York Times Co.*, 206 F.3d 161 (2d Cir. 2000), *aff'd*, 533 US 483 (2001)..............25

*Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp.*, 482 F.3d 1330 (Fed. Cir. 2007) ...............................................................................................................7-8

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .....................................................................25

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ..........................................................................13

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565 (6th Cir. 2008)........................................8

*World Religious Relief v. Gospel Music Channel*, 563 F. Supp. 2d 714 (E.D. Mich. 2008)...11, 12

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012)..................................................25, 26, 27, 28

## STATUTES AND REGULATIONS

17 U.S.C. § 101 ..............................................................................................................................28

17 U.S.C. § 106(6) .....................................................................................................................3, 22

17 U.S.C. § 112(a)(1)......................................................................................................................28

17 U.S.C. § 112(e)(1)......................................................................................................................27

17 U.S.C. § 114(d)(1)(B)(i) ........................................................................................1, 4, 5, 10, 21, 23

17 U.S.C. § 114(d)(1)(C)(i) ...........................................................................................................28

Case 5:14-cv-00015-MFU-JCH   Document 19-1   Filed 06/23/14   Page 5 of 36   Pageid#: 73

17 U.S.C. § 114(d)(2) ...................................................................................................3

17 U.S.C. § 114(f) .......................................................................................................3

17 U.S.C. § 114(g)(2)(B) .............................................................................................3

17 U.S.C. § 114(g)(2)(C) .............................................................................................3

17 U.S.C. § 114(g)(2)(D) .............................................................................................3

17 U.S.C. § 114(g)(3) ..................................................................................................4

17 U.S.C. § 114(j) ......................................................................................................23

17 U.S.C. § 114(j)(12) ...............................................................................................22

17 U.S.C. § 802(f)(1) .................................................................................................24

28 U.S.C. § 2201(a) .....................................................................................................7

Va. Code Ann. § 8.01-328.1 ......................................................................................14

37 C.F.R. Part 380 Subpart B ...................................................................................25

37 C.F.R. § 261.3 .......................................................................................................24

37 C.F.R. § 370.2 ..................................................................................................5, 17

37 C.F.R. § 370.4 .........................................................................................................5

37 C.F.R. § 370.4(e)(4) ...............................................................................................4

37 C.F.R. § 380.10 .......................................................................................................4

37 C.F.R. § 380.13 .......................................................................................................4

37 C.F.R. § 380.13(i) ...................................................................................................5

47 C.F.R. § 76.1200(b) ..............................................................................................27

**LEGISLATIVE MATERIALS**

141 Cong. Rec. 22781 (1995) ...................................................................................26

*Copyrighted Webcast Programming on the Internet: Hearing Before the Subcomm. on
     Courts and Intellectual Prop. of the H. Comm. on the Judiciary*, 106th Cong. (2000)
     (prepared statement of Marybeth Peters, the Register of Copyrights)...................27

H.R. Rep. No. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 .......................28

S. Rep. No. 104-128 (1995), *reprinted in* 1995 U.S.C.C.A.N. 356 ................................................28

S. Rep. No. 106-42 (1999) ........................................................................................................26

**OTHER AUTHORITIES**

Cable Compulsory License, Definition of Cable System, 57 Fed. Reg. 3284 (Jan. 29, 1992) ........................................................................................................................................26

Determination of Reasonable Rates & Terms for the Digital Performance of Sound Recordings & Ephemeral Recordings, 67 Fed. Reg. 45,240 (July 8, 2002) ...............21, 24, 28

Mechanical and Digital Phonorecord Delivery Rate Adjustment Proceeding, 71 Fed. Reg. 64,303 (Nov. 1, 2006) ..........................................................................................................25-26

Public Performance of Sound Recordings: Definition of a Service, 65 Fed. Reg. 77,292 (Dec. 11, 2000) ........................................................................................................................26

Defendant SoundExchange, Inc. ("SoundExchange") hereby moves to dismiss the Complaint of Plaintiffs WTGD 105.1 FM, WQPO 100.7 FM, WJDV 96.1 FM, and M. BELMONT VERSTANDIG INC., d/b/a VerStandig Broadcasting ("VerStandig") (collectively, "Plaintiffs"), pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6).

## INTRODUCTION

There are myriad reasons why this case must be dismissed. *First,* the Court lacks subject matter jurisdiction because no case or controversy yet exists between the parties. The only basis that Plaintiffs allege in support of there being an actual case or controversy is that Plaintiffs unilaterally sent SoundExchange a letter asking SoundExchange's view on whether a certain provision of federal law would apply to them if they implemented a new so-called "geofencing" technology. Specifically, Plaintiffs – a radio broadcast company and several radio stations it operates – asked SoundExchange whether, under 17 U.S.C. § 114(d)(1)(B)(i), they would be exempt from paying royalties to the relevant copyright owners *if* they limited the reach of their internet radio streams to less than 150 miles. SoundExchange answered the question by referring Plaintiffs to controlling law holding that the exemption at issue does not apply to transmissions made over the internet, regardless of whether they reach more or less than 150 miles. SoundExchange did not threaten litigation, and there was no further contact between the parties. Plaintiffs have not yet implemented any "geofencing" technology, nor have they alleged that they have selected a particular technological solution, purchased anything, tested anything or undertaken any concrete steps – other than talking to various experts and potential service providers – toward its implementation. Thus, any adjudication of how a geofencing technology *might* work or of how reliable it *might* be would amount to an impermissible advisory opinion on a hypothetical set of facts.

*Second,* the Court lacks personal jurisdiction over SoundExchange, a non-resident defendant, headquartered in Washington, D.C. The one letter that SoundExchange sent to Plaintiffs was sent only in response to Plaintiffs' unsolicited letter and was sent to Bethesda, Maryland, not Virginia. *See* Compl. Ex. C. SoundExchange has no office in Virginia, does no Virginia-specific outreach or advertising, and has never purposefully availed itself of the laws of Virginia. Indeed, of the royalties that SoundExchange collects and distributes, less than two percent are sent to or received from entities in Virginia, and none of the issues in this fictitious dispute remotely arise out of those *de minimis* contacts.

*Third*, and finally, the Complaint fails to state a claim on which relief can be granted. The statutory provision at issue provides an exemption from the obligation to pay royalties for the digital transmission of copyrighted music where the digital stream at issue is a retransmission of an over-the-air radio broadcast, *and* the broadcast is not "willfully and repeatedly" retransmitted more than 150 miles from the broadcaster's radio transmitter. This Court cannot possibly determine at this time whether and how well a particular geofencing technology will work and what Plaintiffs' state of mind will be if it is ever implemented and tested. However, even assuming for purposes of this motion that some geofencing technology would work perfectly, the exemption would not be available to Plaintiffs as a matter of law. As the Copyright Office has definitively ruled, the 150-mile exemption applies to digital retransmissions of radio broadcasts over cable and satellite systems, but does *not* apply to transmissions made over the internet. There is no reason this Court should come to a different conclusion. Courts routinely defer to such determinations of the Copyright Office. Its decision on this issue is supported by the structure of the statute and by its legislative history, it has been the settled law for over a decade, and no court has ever ruled to the contrary.

For all of these reasons, Plaintiffs' Complaint should be dismissed.

## BACKGROUND

### I.    The Statutory and Regulatory Framework

The Copyright Act provides that the copyright owner of a sound recording (typically a record company) has the exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission."  17 U.S.C. § 106(6).  Thus, if music services, like Plaintiffs, wish to digitally transmit sound recordings to their listeners over the internet, they must obtain licenses to perform the copyrighted work.[1]

Rather than require every music service to negotiate separate licenses with every copyright owner, Congress grants certain types of services – including broadcasters, like Plaintiffs, who want to play sound recordings over the internet – a "statutory licens[e]" to perform all sound recordings, subject to certain conditions.  *Id.* § 114(d)(2).  The statutory license – also known as a "compulsory license" because it cannot be withheld by the copyright owners – guarantees immediate, full, and unfettered access to all commercially released sound recordings.  *See id.*  "[R]easonable rates and terms of royalty payments" under the statutory license are set by the Copyright Royalty Board ("CRB") in adversarial proceedings that occur every five years.  *Id.* § 114(f).  Section 114 of the Copyright Act guarantees performing artists (*i.e.*, singers and musicians) a percentage of the royalties from the statutory license, even though the copyrights typically are owned by the record companies.  *Id.* § 114(g)(2)(B)-(D).  Section

---

[1]    Radio stations are not required to pay royalties for their terrestrial broadcasts of copyrighted sound recordings under the Copyright Act.  This case does not raise any question about Plaintiffs' performance of such recordings in their FM radio broadcasts, but only relates to their proposed digital (*i.e.*, internet) transmissions.

Case 5:14-cv-00015-MFU-JCH   Document 19-1   Filed 06/23/14   Page 10 of 36   Pageid#: 78

114(d) also sets forth certain related limitations on copyright owners' exclusive rights in sound recordings, including the following limitation at issue here:

> **(1) Exempt transmissions and retransmissions. —** The performance of a sound recording publicly by means of a digital audio transmission, other than as a part of an interactive service, is not an infringement of section 106(6) if the performance is part of—
>
>        * * *
>
> **(B)** a retransmission of a nonsubscription broadcast transmission: Provided, that, in the case of a retransmission of a radio station's broadcast transmission—
>
> > **(i)** the radio station's broadcast transmission is not willfully or repeatedly retransmitted more than a radius of 150 miles from the site of the radio broadcast transmitter . . . .

17 U.S.C. § 114(d)(1)(B)(i). As demonstrated below, this exemption has no applicability to Plaintiffs' proposed transmissions over the internet.

## II.   SoundExchange

SoundExchange is an independent nonprofit organization located in Washington, D.C. *See* Decl. of Jonathan Bender, dated June 23, 2014 ("Decl.") ¶ 2. The CRB has designated SoundExchange as the sole entity in the United States to collect digital performance royalties from statutory license users and to distribute those royalties to performing artists and copyright owners. Specifically, SoundExchange is charged by regulation with administering the statutory license, collecting and distributing statutory royalties, and enforcing the terms of the statutory license. *See, e.g.*, 17 U.S.C. § 114(g)(3); 37 C.F.R. §§ 370.4(e)(4), 380.10, 380.13. Pursuant to this authority, digital music services such as satellite radio, internet radio, cable TV music channels, and other types of services that have elected to operate under the statutory license pay the appropriate royalties to SoundExchange. In turn, SoundExchange distributes those royalties to the appropriate artists and record companies. SoundExchange itself does not own copyrights in any sound recordings, Decl. ¶ 20, nor does the Complaint allege otherwise.

4

If a music service wishes to operate pursuant to the statutory license, at the rates set by the CRB, it must first submit a Notice of Use of Sound Recordings Under Statutory License to the United States Copyright Office in Washington, D.C. 37 C.F.R. § 370.2. Thereafter, the licensee may begin making royalty payments to SoundExchange, and SoundExchange in turn distributes these royalties to copyright owners and artists throughout the world. In addition to royalty payments, each licensee must send SoundExchange monthly "reports of use" and "statements of account" that detail which sound recordings were performed and how the licensee calculated the amount due to SoundExchange. *See, e.g.*, 37 C.F.R. § 370.4; Decl. ¶ 7. SoundExchange then calculates the amount of royalties due to each copyright owner and artist based on these reports and statements. *See, e.g.*, 37 C.F.R. § 380.13(i); Decl. ¶ 8.

### III.     SoundExchange's History with Plaintiffs

On February 28, 2014, SoundExchange received a letter from Plaintiff VerStandig, seeking SoundExchange's views on the scope of § 114(d)(1)(B)(i) of the Copyright Act, quoted above. *See* Compl. Ex. B. The letter stated that VerStandig "owns and operates WTGD 105.1 FM" and that "[i]n the near future, WTGD intends to commence internet streaming of its terrestrial radio broadcasts through a process known as 'geofencing.'" *Id.* The letter set forth Plaintiffs' position as to their legal obligations under the Copyright Act, and asked SoundExchange to respond:

> [Plaintiffs] believe that once a station constrains or "geofences" its signal to 150 miles or less, it will conform to the exemption from the statutory license for sound recordings under Section 114 of the U.S. Copyright Act, so that it would owe no payments to SoundExchange.
> . . . .
>
> Our client wishes to insure that its understanding of the Act is correct, and would prefer to avoid a dispute with SoundExchange over the issue.

*Id.* (citing § 114(d)(1)(B)(i)).

On March 14, 2014, SoundExchange responded by letter. SoundExchange stated that it "does not share [Plaintiffs'] view concerning Section 114(d)(1)(B)(i). The exemption in Section 114(d)(1)(B)(i) applies to retransmissions of broadcasts by cable systems to their subscribers or retransmissions by broadcasters over the air. It does not apply when broadcasters simulcast their own programming over the internet." Compl. Ex. C (citation omitted). It thus urged Plaintiffs to seek a license for their internet transmissions and directed them to the Copyright Office and SoundExchange websites for more information on how to do so. *See id.* The letter did not threaten or even imply a threat of litigation.

Consistent with the allegations in the Complaint, SoundExchange had no further contact with Plaintiffs. Decl. ¶ 14. Approximately six weeks later, Plaintiffs filed this declaratory judgment action against SoundExchange, notwithstanding Plaintiffs' self-serving statement that their letter was intended to "avoid a dispute" and "avoid . . . unnecessary litigation," Compl. Ex. B.[2]

## ARGUMENT

### I. This Court Lacks Subject Matter Jurisdiction Over Plaintiffs' Declaratory Judgment Action

Plaintiffs' action for declaratory relief must be dismissed for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), because the Complaint fails to allege any real and immediate controversy between the parties. Indeed, the case presents an illusory dispute, contrived by Plaintiffs to goad this Court into giving them an advisory opinion on the

---

[2] Plaintiffs' Prayer for Relief asks the Court to issue declarations on a range of legal and factual propositions that were not raised in its letter to SoundExchange, extend beyond the facts alleged in the Complaint, and are clearly inappropriate for declaratory relief.

applicability of federal law to a new and untested field of technology. The issue is purely hypothetical, and is one that does not directly implicate SoundExchange.

Article III extends the jurisdiction of federal courts "only to cases and controversies, thus precluding courts from issuing advisory opinions." *Richmond Med. Ctr. For Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009); *see also Ostergren v. Cuccinelli*, 615 F.3d 263, 287 (4th Cir. 2010). The Declaratory Judgment Act thus provides that a federal court may issue a declaratory judgment "[i]n a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201(a).

As Courts have explained, subject matter jurisdiction exists under the Declaratory Judgment Act where the parties' dispute is "definite and concrete, touching the legal relations of parties having adverse legal interests," is "real and substantial," and "admi[ts] of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotation marks omitted); *see also Miller v. Augusta Mut. Ins. Co.*, 157 F. App'x 632, 637 (4th Cir. 2005). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

A hypothetical or abstract dispute does not present a case or controversy. *MedImmune*, 549 U.S. at 127; *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 240-41 (1937). "Although there can be a fine line between declaratory judgments and advisory opinions, the Supreme Court maintains the necessity of avoiding issuing advisory opinions based upon hypothetical facts." *Teva Pharmas. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1338

7

(Fed. Cir. 2007) (citing *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419 (1938)).  Thus, a claim is

"not ripe for adjudication if it rests upon contingent future events that may not occur as

anticipated, or indeed may not occur at all."  *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d

565, 581-82 (6th Cir. 2008) (quotation marks omitted).  The burden is on the party claiming

declaratory judgment jurisdiction to establish that jurisdiction existed at the time the claim for

declaratory relief was filed.  *Benitec Austl., Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed.

Cir. 2007).

### A.  The Declaration Sought by Plaintiffs Would Be An Impermissible Advisory Opinion Under A Hypothetical State of Facts.

It is well established that where, as here, a plaintiff seeks a declaration as to how federal

law would treat an activity that the plaintiff has not yet undertaken, the claim is not ripe for

judicial review.  A party "may not 'obtain a declaratory judgment merely because it would like

an advisory opinion on whether it would be liable for . . . infringement if it were to initiate some

merely contemplated activity.'"  *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 881 (Fed. Cir.

2008) (citing *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir.

1988)); *see also IMS Health, Inc. v. Vality Tech., Inc.*, 59 F. Supp. 2d 454, 460 (E.D. Pa. 1999)

(declaratory judgment regarding alleged copyright infringement "must change or clarify the legal

status of the parties, not merely lend the opinion of the court on a hypothetical set of facts").

Rather, courts have recognized that, at a very minimum, "for a controversy to qualify as

'immediate' within the contours of subject matter jurisdiction, 'there must be a showing of

meaningful preparation for making or using [a] product.'"  *Alpharma, Inc. v. Purdue Pharma

L.P.*, 634 F. Supp. 2d 626, 631 (W.D. Va. 2009) (quoting *Cat Tech LLC*, 528 F.3d at 881)

(bracket in original).

Here, the sum total of Plaintiffs' allegations is that they have "consulted with geo-fencing experts and service providers." Compl. ¶ 35. They do not claim to have taken any steps toward or to have made any actual investment in developing, testing or implementing geofencing technology. Indeed, the Complaint suggests that multiple "service providers" have their own particular approaches and solutions for geofencing, and does not indicate that Plaintiffs have even selected a particular approach or solution for implementation. As such, the Complaint does not even begin to allege the requisite "meaningful preparation" required by this and other courts. *See Alpharma*, 634 F. Supp. 2d at 631 (finding "meaningful preparation" where plaintiff had invested $40 million and produced commercial quantities of the actual product at issue); *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1217 (7th Cir. 1980) (finding that plaintiffs' preparations for production, including development of a specific product design and commencement of field testing, "[fell] far short" of establishing a justiciable controversy); *Super Prods. Corp. v. D P Way Corp.*, 546 F.2d 748, 752 (1976) (finding that plaintiffs' development of a product design, construction of product parts, and active solicitation of customer orders generated an immediate controversy).

As one court in this district has explained,

> [a] dispute is real to the extent to which the technology in question is substantially fixed as opposed to fluid and indeterminate at the time declaratory relief is sought. It follows that the greater the variability of the subject of a declaratory-judgment suit, particularly as to its potentially infringing features, the greater the chance that the court's judgment will be purely advisory, detached from the eventual, actual content of that subject—in short, detached from eventual reality.

*Alpharma*, 634 F. Supp. 2d at 631-32 (J. Jones, presiding) (quoting *Cat Tech LLC*, 528 F.3d at 882) (internal quotation marks omitted). Thus, where the technology in question has not yet been implemented, "the plaintiff must establish that the product presented to the court is the

same product which will be produced if a declaration of non-infringement is obtained." *Int'l Harvester Co.*, 623 F.2d at 1216.

In the instant case, implementation of the proposed geofencing technology is "fluid and indeterminate" at best. *Alpharma*, 634 F. Supp. 2d at 632. Although Plaintiffs state that similar technology has been used for other purposes in other industries, Compl. ¶ 34, they do not point to any particular service provider's solution for analysis, nor do they allege that any broadcaster has ever even attempted to use that solution (or any other geofencing technology) to limit the geographic reach of an internet stream of FM radio programming. Nor do they point to any facts suggesting the effectiveness of a particular technological solution (or geofencing in general) in the relevant context. It appears that Plaintiffs wish to put this Court in the position of evaluating competing service providers' technological solutions and telling them which, if any, might be effective enough to allow them to avoid their statutory license royalty obligations.

Plaintiffs' claims ultimately depend on their ability to prove the reliability of geofencing technology in limiting the geographic reach of an internet stream of a FM broadcast. Among other things, Plaintiffs must show that they will not "willfully or repeatedly retransmit[]" their FM broadcasts more than 150 miles from the site of their broadcast transmitters. *See* 17 U.S.C. § 114(d)(1)(B)(i). Plaintiffs will be able to make such a showing only if they can demonstrate that a particular unspecified and untested technology is effective and not subject to error.[3] If, as SoundExchange suspects, implementation reveals that some percentage of Plaintiffs' internet transmissions invariably will escape outside the fence, so to speak, then Plaintiffs continued

---

[3] Even if Plaintiffs could make such a showing, their claims would nonetheless fail as a matter of law. As discussed in Part III *infra*, the Copyright Office has definitively held that the 150-mile exemption does not apply to transmissions over the internet. In order for their claims to survive, Plaintiffs would need to convince the Court to part ways with the Copyright Office on this legal issue *and* show that they meet the factual and intent-based prongs of the § 114(d)(1)(B)(i) exemption.

10

transmission of their broadcasts over the internet would fail to meet the statutory exemption's express terms. Today, it is virtually impossible for this Court to make that factual determination, and it is not even apparent how one could reasonably take discovery to explore those facts. It follows that, on the facts alleged in the Complaint, the Court could not render anything but an advisory opinion on a purely hypothetical set of facts.

### B. The Exchange of Letters Does Not Create a Real and Immediate Controversy Between the Parties.

The two letters attached to the Complaint do nothing to render this manufactured controversy any more real or actual. Correspondence alone "cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute. More is required to establish declaratory judgment jurisdiction." *Hewlett-Packard Co. v. Acceleron, LLC*, 587 F.3d 1358, 1362 (Fed. Cir. 2009); *see also Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1384 (Fed. Cir. 2010) (contacting potential declaratory judgment defendant in a "ploy to attempt to generate jurisdiction" is not enough to create an actual controversy); *Invue Sec. Prods., Inc. v. Merch. Techs., Inc.*, No. 12 CV 88, 2012 U.S. Dist. LEXIS 92097, at *9 (W.D.N.C. July 3, 2012) (holding that letter sent by a party "does not establish an adverse legal position"); *Geospan Corp. v. Pictometry Int'l Corp.*, 598 F. Supp. 2d 968, 971 (D. Minn. 2008) (two letters from patent owner do not demonstrate a case or controversy); *World Religious Relief v. Gospel Music Channel*, 563 F. Supp. 2d 714, 716 (E.D. Mich. 2008) (correspondence between parties was insufficient to create an actual controversy of sufficient immediacy for federal declaratory judgment jurisdiction, as "[t]he prospect of litigation was not mentioned by either party, and Defendant's tone in its letters, while protective of what it perceives to be its legal interests, was certainly not threatening.").

Here, there is nothing more. Rather, with no prior contact between the parties, Plaintiffs unilaterally asked SoundExchange for its interpretation of federal law and demanded a response by a certain date. Compl. Ex. B. SoundExchange politely responded. Compl. Ex. C. As such, the Complaint does not allege any "*real* and *immediate* injury or threat of future injury that is *caused by the defendants*." *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1339 (Fed. Cir. 2008) (emphasis in original). In fact, SoundExchange neither defines the scope of the Copyright Act's exemptions, nor owns any copyrighted sound recordings; and, any injury that could hypothetically occur in the future, would not be caused by SoundExchange. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (stating that in order for there to be a "case or controversy," the plaintiff must show that the injury is "'fairly . . . trace[able] to the challenged action of the defendant'") (bracket and ellipses in original).

Similarly, although a specific threat of litigation is not required for there to be an actual case or controversy, it is worth noting that SoundExchange did not threaten litigation in its responsive letter.[4] Compl. Ex. C. In fact, SoundExchange has *never* brought a copyright infringement action. *See* Decl. ¶ 19. Rather, in the more than ten years of its existence, SoundExchange has brought exactly one lawsuit. SoundExchange filed that suit in the District of Columbia, against a differently situated party, and under circumstances that are legally and factually distinct from those that Plaintiffs allege. *See* Decl. ¶ 18; *Prasco, LLC*, 537 F.3d at 1341

---

[4]     Plaintiffs' Complaint also alleges that SoundExchange's "instruction that Plaintiffs review the terms and information on SoundExchange's website, then file a Notice of Use of Sound Recordings Under Statutory License . . . demonstrates that this dispute is ripe for judicial determination." Compl. ¶ 51. In reality, SoundExchange's letter does not issue any instruction, but rather refers the radio station to SoundExchange's website "[s]hould WTGD choose to rely on the statutory performance and reproduction licenses that SoundExchange administers." Compl. Ex. C. Plaintiffs' "effort to create a larger controversy than Defendant asserted. . . . or misinterpretation of Defendant's correspondence can not serve to confer jurisdiction upon the parties' dispute." *World Religious Relief*, 563 F. Supp. 2d at 717.

(noting that "prior litigious conduct is one circumstance to be considered in assessing whether the totality of circumstances creates an actual controversy").

Finally, the scope of the relief Plaintiffs seek far surpasses the issues the parties discussed in their letters. Plaintiffs ask the Court not only to issue a declaration as to § 114(d)(1)(B)(i), but also as to a range of issues that Plaintiffs never raised with SoundExchange prior to the filing of the Complaint, some of which extend beyond the matters addressed in the correspondence. *See, e.g.*, Compl. ¶ 46 (making assertion regarding exemption for "incidental transmission[s]" pursuant to § 114(d)(1)(C)); Prayer for Relief ¶ 4 (seeking declaration that live streaming will "require[] no more than one copy or phonorecord of a particular transmission program embodying a performance of a sound recording under 17 U.S.C. § 112(a)").

For all of these reasons, Plaintiff's Complaint fails to present an actual case or controversy, and should be dismissed for lack of subject matter jurisdiction.[5]

## II. SoundExchange Is Not Subject To Personal Jurisdiction in Virginia.

This case must be dismissed for the independent reason that the Court lacks personal jurisdiction over SoundExchange, a non-resident of Virginia. Pursuant to Federal Rule of Civil Procedure 12(b)(2), a complaint must be dismissed absent a showing that the court has either

---

[5]     Even if there were a justiciable controversy (which there is not), the Court should decline to exercise its jurisdiction under the Declaratory Judgment Act. District courts "'possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites.'" *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1376 (Fed. Cir. 2012) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)). Here, because we cannot yet know how the geofencing technology will work, any declaration rendered by the Court will not be determinative of Plaintiffs' rights. Additionally, even if the Court were to issue a judgment in this case, such an order would "serve no useful purpose" because it would not prevent copyright owners or artists from bringing subsequent infringement actions against Plaintiffs based on transmissions over the internet. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) ("If a district court, in the sound exercise of its judgment, determines after a complaint is filed that a declaratory judgment will serve no useful purpose, it cannot be incumbent upon that court to proceed to the merits before staying or dismissing the action.").

general or specific personal jurisdiction over a non-resident defendant. The plaintiff bears the burden of establishing that the court has personal jurisdiction over the defendant. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993); *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

## A. SoundExchange Is Not Subject to Specific Personal Jurisdiction in This Court.

In determining whether courts may exercise specific personal jurisdiction over a defendant, courts engage in a two-step inquiry as to: (1) whether jurisdiction is authorized by state law (here, Virginia's long-arm statute under Va. Code Ann. § 8.01-328.1), and (2) whether the court's exercise of jurisdiction comports with constitutional due process. *See Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory"*, 283 F.3d 208, 212 (4th Cir. 2002). As a practical matter, because "Virginia's long-arm statute . . . extend[s] personal jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause of the Fourteenth Amendment," the statutory inquiry merges with the constitutional inquiry in Virginia. *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009).

Constitutional due process requires that the defendant have "minimum contacts with [the forum state] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). To meet this test, the plaintiff must show that a defendant "'purposefully directed' his activities at the residents of the forum and that the litigation results from alleged injuries that 'arise out of or related to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted); *see also ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997) (the "touchstone . . .

14

remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state" (quotation marks omitted)).[6]

To assess whether a defendant has "purposefully availed" itself of the privileges and protections of the forum state, courts in the Fourth Circuit consider seven non-exclusive factors: (1) whether the defendant maintains offices or agents in the forum state; (2) whether the defendant owns property in the forum state; (3) whether the defendant reached into the forum state to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the forum state; (5) whether the parties contractually agreed that the law of the forum state would govern disputes; (6) whether the defendant made in-person contact with the resident of the forum state in the forum state regarding the business relationship; and (7) the nature, quality and extent of the parties communications about the business being transacted. *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

Here, Plaintiffs make no allegations regarding most of these factors, and there is no dispute that most factors are not satisfied. SoundExchange does not maintain offices in Virginia. Decl. ¶ 4. It owns no property in Virginia. Decl. ¶ 5. It has never had any in-person contact with Plaintiffs in Virginia. Decl. ¶ 12. It has not entered into any contract with Plaintiffs, nor has it willingly subjected itself to the application of Virginia law. Decl. ¶ 15; *cf.* Compl. Ex. A at 4 (SoundExchange Sound Recording Copyright Owner Membership Agreement, providing that "the law of the District of Columbia shall apply" with regard to disputes with members). It has

---

[6]     The Fourth Circuit has held that courts must consider, in order: "'(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 (4th Cir. 2009) (citing *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)).

never filed suit in Virginia.  Decl. ¶¶ 18-19.  It does not direct its activities specifically to Virginia and does not conduct any Virginia-specific advertising or outreach to potential licensees.  Decl. ¶ 16.

Rather, the allegations in the Complaint going to specific personal jurisdiction are that: (1) Plaintiffs and SoundExchange exchanged the one set of letters discussed above, Compl. ¶¶ 36-38; and (2) two of the Plaintiff stations pay royalties to SoundExchange, *id.* ¶¶ 7-8, 25. These contacts fall far short of the contacts necessary to subject SoundExchange to specific personal jurisdiction in Virginia.

It is clear that the parties' exchange of letters does not create specific jurisdiction. Significantly, neither letter was sent to or from Virginia.  *See* Compl. Exs. B, C.  Moreover, in declaratory judgment actions for noninfringement of copyrights and patents, courts have consistently held that merely sending a letter to a prospective defendant does not meet the "minimum contacts" test.  *See, e.g.*, *Modern Computer Corp. v. Ma*, 862 F. Supp. 938, 945 (E.D.N.Y. 1994) ("Courts have consistently held that . . . the sending of a cease and desist letter to the alleged infringer is alone insufficient to establish the minimum contacts necessary for personal jurisdiction"); *Database Am., Inc. v. Bellsouth Advertising & Publishing Corp.*, 825 F. Supp. 1195, 1213 (D.N.J. 1993) (collecting cases).  To hold otherwise would chill communications between potential parties and would "result in 'blitzkrieg' litigation" by declaratory judgment plaintiffs.  *Database*, 825 F. Supp. at 1213 n.30 (quoting *E.J. McGowan & Assocs., Inc. v. Biotechnologies, Inc.*, 736 F.Supp. 808, 812 n.7 (N.D. Ill. 1990)).  Here, Plaintiffs initiated the exchange of letters, and SoundExchange merely responded.  "Jurisdiction may not be manufactured by the conduct of others," in this way.  *Chung v. NANA Dev. Corp.,* 783 F.2d 1124, 1127 (4th Cir. 1986).

16

It is equally unavailing that Plaintiffs regularly pay royalties to SoundExchange for distribution to the appropriate copyright owners and artists. SoundExchange did not solicit or initiate that relationship with Plaintiffs. Decl. ¶ 10. To the contrary, Plaintiffs unilaterally decided to take advantage of the statutory license, and they began doing so by sending a Notice of Use to the United States Copyright Office in Washington, D.C. 37 C.F.R. § 370.2. Only after the Copyright Office informed SoundExchange that a Notice of Use had been filed did SoundExchange have contact with Plaintiffs. *See CFA Inst.*, 551 F.3d at 295 n.17 (district courts "are entitled to accord special weight to" which party "initiated contact" (citing *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Care Partners*, 229 F.3d 448, 451 (4th Cir. 2000))); *Hanes Companies, Inc. v. Galvin Bros., Inc.*, No. 09CV918, 2013 WL 594013 (M.D.N.C. Feb. 15, 2013) (noting that "the Fourth Circuit 'has given great weight to the question of who initiated the contact between the parties'" and collecting cases (quotation marks omitted)), *report and recommendation adopted by*, 2013 WL 941791 (M.D.N.C. Mar. 11, 2013).

By filing a Notice of Use with the Copyright Office and making a determination that it would pay royalties under the statutory license, Plaintiffs unilaterally initiated a relationship with SoundExchange. Neither Plaintiffs' decision to do so nor the resulting relationship can form the basis for specific jurisdiction, because specific jurisdiction attaches only "where the contacts [at issue] proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum state." *Burger King*, 471 U.S. at 475 (quotation omitted; emphasis in original); *id.* ("unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state. . . ."); *see also Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Care Partners*, 229 F.3d 448, 450 (4th Cir. 2000) (affirming district court's finding of no personal jurisdiction where defendant entered into

contracts in Virginia, communicated with plaintiff in Virginia, and mailed an "occasional payment" to Virginia; but did not "seek out the forum corporation," "anticipate that the forum corporation would provide its services predominantly from the forum," or agree to a contract governed by Virginia such that it could "expect to be haled into Court in Virginia"); *Eagle Paper Int'l, Inc. v. Expolink, Ltd.*, No. 2:07cv160, 2008 WL 170506, at *5 (E.D. Va. Jan. 17, 2008) ("[I]t is well settled that mere telephone calls and electronic communications in furtherance of a transaction are insufficient to constitute purposeful activity.").

Finally, Plaintiffs certainly cannot show that that their claims "arise out of" these *de minimis* contacts. *See Consulting Engineers*, 561 F.3d at 278. Specific jurisdiction is unavailable unless there is a nexus between a defendant's contact with the forum state and the particular dispute at issue. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413-14 (1984) (for specific jurisdiction, "relationship among the defendant, the forum, *and the litigation* is . . . essential") (quotation marks omitted; emphasis added); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (specific jurisdiction is not available "if the defendant's contacts with the State are not also the basis for suit"; in such cases, a plaintiff must satisfy the more demanding general jurisdiction standard). Here, Plaintiffs do not allege – nor could they – that their claims of being exempt from having to pay royalties if a geofencing technology is implemented and works according to plan have anything to do with Plaintiffs' payments of royalties to SoundExchange or any communications incident to those payments. *See Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004) ("a defendant's actions must have been directed at the forum state in more than a random, fortuitous, or attenuated way" (quotations omitted)). Thus, the Court does not have specific personal jurisdiction here.

**B. This Court Lacks General Jurisdiction**

Plaintiffs have also failed to allege facts that could establish general personal jurisdiction over SoundExchange. General jurisdiction exists for claims distinct from a defendant's in-state activities when a defendant's activities in the jurisdiction have been "continuous and systematic." *Helicopteros*, 466 U.S. at 414-15 & n.9; *see also CFA Inst.*, 551 F.3d at 292 n.15 ("General personal jurisdiction . . . requires 'continuous and systematic' contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred."). General jurisdiction thus requires application of a "more demanding standard than is necessary for establishing specific jurisdiction." *ALS Scan*, 293 F.3d at 712. Plaintiffs cannot meet this heightened standard.

In 2013, royalties paid to SoundExchange by licensees in Virginia represented less than 1% of the total royalties paid. Decl. ¶ 6. In turn, less than 2% of members and registrants to whom SoundExchange sends royalty checks have Virginia addresses.[7] Decl. ¶ 8. It is well established that an entity is not subject to general personal jurisdiction when such a small portion of its overall activities are in the forum state. *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1198, 1200 (4th Cir. 1993) (upholding finding that general jurisdiction did not exist over defendant that did 2% of its total sales – even where it had approximately 20 employees in forum state); *ESAB Grp.*, 126 F.3d at 624 (upholding finding that general jurisdiction did not exist where small percentage of defendant's customers were in the forum state). Where, as here, a company "focuse[s] its activities more generally on customers located throughout the United States . . . without focusing on and targeting" the forum state, such activities do not confer general personal jurisdiction. *ESAB Grp.*, 126 F.3d at 625-26.

---

[7] The heaviest concentrations of SoundExchange licensees and payees are in states with large music industries like California, New York, and Tennessee. Decl. ¶ 9.

Nor does SoundExchange's website provide a basis for general jurisdiction. A Virginia court does not obtain general jurisdiction over an out-of-state defendant based merely on the fact that Virginia residents can access the defendant's passive website. *ALS Scan*, 293 F.3d at 715. SoundExchange's website is passive with regard to licensees. Decl. ¶ 17; Compl. ¶ 24. Licensees cannot, for instance, file a Notice of Use, submit payment, or submit reports of use via the website. Decl. ¶ 17. In fact, Plaintiffs' factual allegations regarding the website are a textbook description of a "passive" internet site, which "merely makes information available" to the public.[8] *Carefirst of Md., Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 399 (4th Cir. 2003). Specifically, the Complaint states that

> SoundExchange uses its Internet website (www.soundexchange.com) to communicate and direct information to copyright owners, statutory licensees, and potential or prospective licensees, including FCC-licensed radio stations. SoundExchange's Internet website provides information about its advocacy on behalf of copyright owners, statutory license rates, and the process for submitting regular, detailed reports regarding the sound recordings a licensees digitally performs. SoundExchange's Internet website directs statutory licensees to report the audience measurement—the number of listeners that have access to the performance—for each sound recording digitally performed. And SoundExchange's Internet website explains to potential or prospective licensees how they can enter into the statutory license and thus enter into a relationship with SoundExchange.

Compl. ¶ 24. Such passive websites – even semi-interactive websites – do not confer general personal jurisdiction. *See, e.g.*, *Baker v. Patterson Med. Supply, Inc.*, No. 11CV37, 2011 WL 7153948, at *8 (E.D. Va. Nov. 17, 2011) (finding fact that defendants maintain a semi-interactive website accessible in Virginia did not create jurisdiction where plaintiff did "not put forth evidence of significant Virginia contacts via the website"), *report and recommendation*

---

[8] The one non-passive aspect of the website is that record companies and artists may register with SoundExchange online. *See* Decl. ¶ 17. However, all membership agreements explicitly provide that they will be governed by the laws of the District of Columbia, *see* Ex. A. to Compl. § 12(b); this aspect of the website is not available to licensees; and there are no interactive tools that Plaintiffs or other licensees can use.

*adopted by*, 2012 WL 380109 (E.D. Va. Feb. 6, 2012); *see also Calder v. Jones*, 465 U.S. 783, 789-90 (1984) (defendant must have "aimed" its challenged conduct at the forum state); *ESAB Group*, 126 F.3d at 625-26 (same); *Chiaphua Components Ltd. v. W. Bend Co.*, 95 F. Supp. 2d 505, 512 (E.D. Va. 2000) ("Given that [Defendant] is not primarily an Internet based company and a lack of significant Virginia contacts with the Internet site, the Court is unwilling to accord undue weight to the fact of an Internet presence by the Defendant").

Because Plaintiffs have failed to allege even a *prima facie* showing of specific or general personal jurisdiction over SoundExchange, the Complaint must be dismissed pursuant to Rule 12(b)(2).

### III.    Plaintiffs Fail to State a Claim For Which Relief Can Be Granted.

While Plaintiffs seek an improper advisory opinion from this Court concerning various permutations on the issue, the core question presented in the Complaint is whether the transmission of Plaintiffs' broadcast programming over the internet (often referred to as a "simulcast") to listeners within a 150-mile radius of their FM transmitters are exempt from copyright liability pursuant to § 114(d)(1)(B)(i) of the Copyright Act, 17 U.S.C. § 114(d)(1)(B)(i).  Compl. ¶¶ 1-3, 5.  Even assuming the truth of Plaintiffs' allegations, the structure and legislative history of the Copyright Act require answering that question in the negative.  Indeed, the United States Copyright Office – the agency charged with interpreting and applying the Copyright Act – made a bright-line ruling that the so-called 150-mile exemption simply does not apply to transmissions made over the internet, regardless of the extent of the transmission's geographic reach.  *See* Determination of Reasonable Rates & Terms for the Digital Performance of Sound Recordings & Ephemeral Recordings, 67 Fed. Reg. 45,240 (July 8, 2002).  That interpretation, which is plainly correct, has been the settled law for over a decade.

Because § 114(d)(1)(B)(i) does not, as a matter of law, provide Plaintiffs the exemption they seek, this case must be dismissed.[9]

To survive a 12(b)(6) motion, a plaintiff must show that its complaint alleges facts sufficient to support each and every element of the asserted claims. *See Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003); *Labram v. Havel*, 43 F.3d 918, 920-21 (4th Cir. 1995). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted). Rather, even when factual allegations are well-pled, a court should "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## A. The Court Should Defer to the United States Copyright Office's Interpretation of the § 114(d)(1)(B)(i) of the Copyright Act.

Copyright owners of sound recordings generally have the exclusive right to perform their works publicly by means of a digital audio transmission. 17 U.S.C. § 106(6). Internet transmissions such as those described in the Complaint (sometimes referred to as "webcasts") are digital audio transmissions subject to the right granted in § 106(6). *E.g., Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 491 (3d Cir. 2003) ("The parties do not dispute that, under § 106(6), AM/FM webcasting comprises a public digital audio transmission."). That right is subject to two closely related sets of limitations: a series of statutory exemptions in § 114(d)(1) and a statutory license for non-exempt services contained in § 114(d)(2). Programming from two of the Plaintiff

---

[9]     In addition, Plaintiffs' live internet streams are not "retransmissions" as that term is defined in 17 U.S.C. § 114(j)(12). That section provides a common-sense definition of a "retransmission" as "a further transmission of an initial transmission." *Id.* It does not appear from the Complaint that Plaintiffs' computer servers receive the initial over-the-air transmissions and then further transmit those same transmissions. Rather, Plaintiffs' live internet streams appear simply to be distinct digital transmissions. *See* Compl. ¶¶ 27-29 (describing a distinct digital transmission). Because this argument turns on facts that have not yet been developed, SoundExchange is not presenting it here at the pleading stage, past which there is no reason for this case to progress.

radio stations is currently being transmitted over the internet in reliance on the § 114(d)(2) statutory license.  As a result Plaintiff VerStandig is paying royalties to recording artists and copyright owners through SoundExchange.[10]  Compl. ¶¶ 7(b), 8(b).  The question in this case is whether Plaintiff can stop paying on behalf of two stations, and avoid paying on behalf of the third, for future internet transmissions by shoehorning those transmissions into one or more of the exemptions in § 114(d)(1).

The only exemption addressed in the correspondence attached to the Complaint, and the principal exemption addressed in the Complaint, is § 114(d)(1)(B)(i).  That section provides an exemption from the digital performance right for retransmissions of nonsubscription broadcast transmissions, if, in the case of a radio station's broadcast transmission, the primary broadcast transmission is "not willfully or repeatedly retransmitted more than a radius of 150 miles from the site of the radio broadcast transmitter."  17 U.S.C. § 114(d)(1)(B)(i).  Like other exemptions in § 114(d)(1), § 114(d)(1)(B)(i) is highly technical, and rests upon a long series of even more technical definitions found in § 114(j).  17 U.S.C. § 114(j) (among other things defining the terms "broadcast," "nonsubscription" and "retransmission").  However, one principle is clear – the § 114(d)(1)(B)(i) exemption was not intended to apply to internet transmissions.

There is a long history of broadcasters trying to avoid paying royalties to recording artists and copyright owners by stretching § 114(d)(1) exemptions to cover aspects of their operations

---

[10]     The Complaint asserts that WTGD, WQPO and WJDV are "radio stations" and that the latter two are currently paying royalties to SoundExchange.  Compl. ¶¶ 6-8.  These assertions are not consistent with each other.  As a technical legal matter (rather than a matter of common parlance), a radio station is a physical radio station facility (*e.g.*, a transmitter and antenna). *Bonneville*, 347 F.3d at 492-95.  Consistent with that technical definition, the Complaint alleges that Plaintiff VerStandig "owns and operates" the named stations.  Compl. ¶ 9.  Nothing in the Complaint other than the reference to payment indicates that WTGD, WQPO and WJDV are corporate entities or other legal persons.  Because transmitters and antennas do not pay royalties, we refer to VerStandig as the payor.

that Congress did not intend to exempt. This case is not the first time that broadcasters have looked to § 114(d)(1)(B)(i) as a basis to avoid paying for use of the recordings they transmit over the internet. In 2002, the precise issue at the core of the Complaint was squarely presented to the United States Copyright Office, and it unambiguously decided that § 114(d)(1)(B)(i) "does not apply to radio retransmissions made over the Internet." 67 Fed. Reg. at 45,256. The Copyright Office has at all relevant times been the expert agency charged with overseeing interpretation of § 114. *Bonneville Int'l Corp. v. Peters*, 153 F. Supp. 2d 763, 772-73 (E.D. Pa. 2001) (describing the Copyright Office's role with respect to § 114 at the time these issues last arose), *aff'd on other grounds*, 347 F.3d 485 (3d Cir. 2003); 17 U.S.C. § 802(f)(1) (describing current role of the Register of Copyrights – the head of the Copyright Office – in reviewing, and sometimes participating in, rate proceedings to ensure consistent and proper interpretation of the Copyright Act).

That proceeding was the first time there was occasion to set royalty rates for internet streaming. There, the status of internet transmissions of broadcast programming within the 150-mile limit provided by § 114(d)(1)(B)(i) was squarely presented, and its resolution was necessary to the Office's ultimate determination. 67 Fed. Reg. at 45,255-56. After exhaustively analyzing the statutory scheme as a whole, the Office unambiguously concluded that "the better interpretation of the law is that the [§ 114(d)(1)(B)(i)] exemption does not apply to radio retransmissions made over the Internet." 67 Fed. Reg. at 45,256. Based on that conclusion, the Office set royalty rates for internet transmissions, including transmissions of broadcast programming, without regard to the 150-mile limit in § 114(d)(1)(B)(i). 67 Fed. Reg. at 45,273; 37 C.F.R. § 261.3. Broadcasters did not appeal that part of the Office's decision, but they appealed other aspects of the Office's decision, and the decision was affirmed in all relevant

24

respects by the D.C. Circuit. *Beethoven.com LLC v. Librarian of Congress*, 394 F.3d 939, 951-54 (D.C. Cir. 2005). Ever since then, industry stakeholders have accepted the Copyright Office's interpretation of the § 114(d)(1)(B)(i) exemption, and broadcasters have paid statutory royalties for all of their internet transmissions without regard to the 150-mile limit. *See* 37 C.F.R. Part 380 Subpart B.

The Office's interpretation of § 114(d)(1)(B)(i) is entitled to this Court's deference. *Bonneville*, 153 F. Supp. 2d at 771-74 (Congress "entrusted the Copyright Office with the task of determining which . . . means of transmission would be exempted by section 114" and granting *Chevron* deference to the Office's interpretation of the section)); *see also United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (holding that an agency interpretation qualifies for *Chevron* deference when Congress has explicitly or implicitly delegated authority to the agency to make rules carrying the force of law and the agency's interpretation is promulgated in exercise of that authority); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 270 (2d Cir. 2012) (Copyright Office oversees § 111 of the Copyright Act, and its interpretations are entitled to *Chevron* deference); *Satellite Broad. & Comm'ns Ass'n of Am. v. Oman*, 17 F.3d 344, 347-48 (11th Cir. 1994); *Cablevision Sys. Dev. Co. v. Motion Picture Ass'n of Am., Inc.*, 836 F.2d 599, 608-10 (D.C. Cir. 1988).

**B. The Copyright Office Is Correct that § 114(d)(1)(B)(i) Does Not Apply to Transmissions Over the Internet.**

The Copyright Office's interpretation of the 150-mile exemption is also correct. Limitations on copyright rights should be construed narrowly. *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 168 (2d Cir. 2000) (when Copyright Act "sets forth exceptions to a general rule, we generally construe the exceptions narrowly in order to preserve the primary operation of the [provision]") (internal quotation marks omitted, bracket in original)), *aff'd*, 533 U.S. 483 (2001); *Bonneville*, 153 F. Supp. 2d at 774; Mechanical and Digital Phonorecord Delivery Rate

Adjustment Proceeding, 71 Fed. Reg. 64,303, 64,307 & n.48 (Nov. 1, 2006); Public Performance

of Sound Recordings: Definition of a Service, 65 Fed. Reg. 77,292, 77,297-98 (Dec. 11, 2000);

Cable Compulsory License, Definition of Cable System, 57 Fed. Reg. 3284, 3293 (Jan. 29,

1992).  This is appropriate because Congress has recognized that when legislating with respect to

statutory licenses, "it . . . needs to act as narrowly as possible to minimize the effects of the

Government's intrusion on the broader market in which the affected property rights and

industries operate."  S. Rep. No. 106-42, at 10 (1999) (discussing principles for consideration of

satellite statutory license legislation).  As a result, courts have properly rejected efforts by

litigants to stretch the limitations beyond their original purposes.  *See generally, e.g.*, *WPIX*, 691

F.3d at 278-85 (reciting history of § 111 statutory license interpretation before concluding that

internet transmissions are ineligible).

Here, the 150-mile exemption in § 114(d)(1)(B) was intended to exempt "cable radio"

and similar specific satellite transmission technologies that were commercially significant at the

time § 114(d)(1)(B) was enacted:

> The Committee has created the Section 114(d)(1)(B) exemption because it is
> aware that *cable systems and other multichannel programming distributors* often
> offer retransmissions of nonsubscription broadcast transmissions to their
> customers.  At present, copyright liability for these retransmissions ordinarily is
> covered pursuant to Sections 111 and 119 of the Act.  . . .  A *cable system's*
> delivery of a retransmitted radio broadcast signal within 150 miles of the
> transmitter, for example, will be exempt under Section 114(d)(1)(B)(i), even if the
> cable system charges a monthly fee to subscribers to receive the signal.

141 Cong. Rec. 22781 (1995) (emphasis added).  Congress' specific references to cable and

other multichannel programming systems, as well as its references to §§ 111 and 119 (which

address retransmissions by cable and satellite systems), confirms that Congress did not intend

§ 114(d)(1)(B) to address internet transmissions.  *See, e.g.*, *WPIX*, 691 F.3d at 283 (stating that

"[t]he Copyright Office has consistently concluded that Internet retransmission services are not

cable systems"); *Copyrighted Webcast Programming on the Internet: Hearing Before the Subcomm. on Courts and Intellectual Prop. of the H. Comm. on the Judiciary*, 106th Cong. 25-26 (2000) (prepared statement of Marybeth Peters, the Register of Copyrights) ("[T]he section 111 license [for cable systems] does not and should not apply to Internet retransmissions." (citation omitted)); 47 C.F.R. § 76.1200(b) (defining "[m]ultichannel video programming distributors" to include cable operators and satellite services without mention of internet transmission services).

Consistent with Congress' expressed intention that § 114(d)(1)(B) was intended to apply to cable and satellite systems, the Copyright Office concluded that if § 114 is read together with § 112, applying § 114(d)(1)(B)(i) to internet transmissions would produce anomalous results. Section 112 governs so-called "ephemeral recordings." In the context of internet transmissions, ephemeral recordings are "the temporary copies necessary to facilitate the transmission of sound recordings during internet broadcasting." *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,* 574 F.3d 748, 753 (D.C. Cir. 2009) (quoting *Beethoven.com*, 394 F.3d at 942-43). When Congress extended the § 114 statutory license to webcasts, it provided a parallel and closely related statutory license for ephemeral recordings. However, this statutory license applies only to "transmitting organization[s] entitled to transmit to the public a performance of a sound recording under the limitation on exclusive rights specified by section 114(d)(1)(C)(iv) or under a statutory license in accordance with section 114(f)." 17 U.S.C. § 112(e)(1). The Office was persuaded that because Congress understood internet transmissions to involve the making of ephemeral recordings, but failed to provide an ephemeral recordings exemption or statutory a license for services operating under the § 114(d)(1)(B) exemption, "Congress did not

contemplate that that exemption would be available to services making retransmissions via the Internet."  67 Fed. Reg. at 45,256.[11]

Because the Copyright Office is the federal agency charged with oversight of the intricate system of § 114 exemptions and statutory license, and it has reasonably and persuasively concluded that the § 114(d)(1)(B)(i) exemption does not apply to internet transmissions, this Court must defer to that conclusion.  *See Bonneville*, 153 F. Supp. 2d at 771-74; *see also WPIX*, 691 F.3d at 283-85; *SBCA*, 17 F.3d at 347-48; *Cablevision*, 836 F.2d at 608-10.  Because the Plaintiffs' intended transmissions over the internet do not qualify for the § 114(d)(1)(B)(i) exemption, this action should be dismissed as a matter of law pursuant to Rule 12(b)(6) for failure to state a claim.[12]

---

[11]     The Complaint asserts that Plaintiffs could transmit as proposed without infringing the reproduction right based on § 112(a).  Compl. ¶ 48.  Section 112(a) is inapposite to Plaintiffs' activities, because it applies only to reproduction of a "transmission program."  17 U.S.C. § 112(a)(1).  The term transmission program is defined in § 101 of the Copyright Act as, in essence, a television or radio show.  *See* 17 U.S.C. § 101.  Section 112(a) was intended to allow broadcasters to pre-record shows for later transmission.  *See* H.R. Rep. No. 94-1476, at 101-03 (1976), *reprinted in*, 1976 U.S.C.C.A.N. 5659, 5715-18.  Moreover, Plaintiffs' unique licensing situation is irrelevant to the legal analysis undertaken by the Copyright Office, because the Office was using § 112 as a signal of Congress's intentions concerning the § 114(d)(1)(B)(i) exemption, and not analyzing the infringement liability of any particular service.

[12]     The Complaint passingly asserts that Plaintiffs' intended internet transmissions are separately exempt as "incidental" transmissions pursuant to § 114(d)(1)(C)(i).  Compl. ¶ 46.  The correspondence attached to the Complaint does not address that argument, and Plaintiffs do not request declaratory relief on that basis, so the issue does not seem properly presented.  In any event, § 114(d)(1)(C)(i) is wholly irrelevant.  It makes no reference to the 150-mile limit Plaintiffs read into it.  Instead it applies to an incidental transmission "such as a feed."  17 U.S.C. § 114(d)(1)(C)(i).  An "incidental transmission" is a transmission that facilitates the transmission of the sound recording that is ultimately broadcast to the public.  *See* S. Rep. No. 104-128, at 21-22 (1995), *reprinted in*, 1995 U.S.C.C.A.N. 356, 368-69 (explaining the meaning of "incidental transmission" and listing a satellite feed from a network to a station and a "backhaul" transmission from an event at a remote location to a station as examples).  Congress specifically did not intend this exemption to reach transmissions to the public over the internet.  *Id.* at 22, *reprinted in*, 1995 U.S.C.C.A.N. at 369 ("a retransmission that is available for general reception by the public (for example, *through the Internet*), which is not being used to facilitate an exempt

## CONCLUSION

For the reasons stated above, the Complaint should be dismissed.


June 23, 2014                                          Respectfully submitted,


                                                      /s/ D. Stan Barnhill
                                                      D. Stan Barnhill
                                                      Virginia Bar Number: 22978
                                                      WOODS ROGERS PLC
                                                      P.O. Box 14125
                                                      Roanoke, VA 24038-4125
                                                      Tel: (540) 983-7667
                                                      Fax: (540) 983-7711
                                                      barnhill@woodsrogers.com

                                                      Michael B. DeSanctis
                                                      *pro hac vice* application pending
                                                      Emily L. Chapuis
                                                      *pro hac vice* application pending
                                                      JENNER & BLOCK LLP
                                                      1099 New York Avenue NW, Suite 900
                                                      Washington, D.C. 20001
                                                      Tel: (202) 639-6323
                                                      Fax: (202) 661-4828
                                                      mdesanctis@jenner.com
                                                      echapuis@jenner.com

                                                      *Counsel for Defendant SoundExchange, Inc.*

---

transmission or retransmission, *would not qualify* as an 'incidental retransmission'" (emphasis added)).