UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| WTGD 105.1 FM, et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:14-cv-00015 |
| | ) | |
| SOUNDEXCHANGE, INC., | ) | |
| Defendant. | ) | By:   Joel C. Hoppe |
| | ) |        United States Magistrate Judge |
| | ) | |

REPORT & RECOMMENDATION

This matter is before me for a report and recommendation on the defendant's Motion to
Dismiss the Complaint, ECF No. 19, under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal
Rules of Civil Procedure. Having considered the parties' pleadings and briefs, oral arguments,
and the applicable law, I respectfully recommend that the presiding district judge grant the
motion and dismiss this action because the Complaint, ECF No. 1, fails to allege a justiciable
case or controversy between the parties.[1] *See* Fed. R. Civ. P. 12(b)(1), (h)(3).

I. Background

Plaintiffs are three Harrisonburg-area radio stations, WTGD 105.1 FM, WQPO 100.7
FM, WJDV 96.1 FM, and their corporate owner, M. Belmont VerStandig, Inc. (together,
"Plaintiffs"). Compl. ¶¶ 1, 6–9. Plaintiffs filed a declaratory judgment action in this Court against
SoundExchange, Inc. ("SoundExchange") on April 30, 2014. *Id.* ¶¶ 1, 10. The case involves a

---

[1] Accordingly, this Report and Recommendation does not address the motion to dismiss under
Rules 12(b)(2) and 12(b)(6). *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)
("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to
declare the law, and when it ceases to exist, the only function remaining to the court is that of
announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 7 Wall. 506, 514
(1869)).

1

disagreement over whether sections 112 and 114 of the Copyright Act, 17 U.S.C. §§ 101–1332, allow radio stations to retransmit their broadcast transmissions over the Internet exclusively to their local listeners without paying statutory licensing fees or royalties on copyrighted sound recordings that are part of those simulcasts.[2] *See id.* ¶¶ 47–48.

Plaintiffs believe that their local simulcasts will satisfy the Copyright Act's criteria for "non-infringing" performances so that they have no obligation to obtain statutory licenses or pay royalties to SoundExchange for the privilege of performing copyrighted sound recordings. *See id.* ¶¶ 40–48; Compl. Ex. B, at 2, ECF No. 1-2. SoundExchange believes that radio stations' simulcasts are never exempt from the Copyright Act's licensing and royalty requirements. *See* Compl. ¶¶ 47–48; Compl. Ex. C, at 2, ECF No. 1-3. SoundExchange, however, has not taken a position on whether Plaintiffs should obtain statutory licenses and pay it royalties, rather than negotiating private licenses and paying royalties directly to individual copyright owners. *See* Compl. Ex. C, at 2.

A.     *The Statutory & Regulatory Framework*

The Copyright Act grants owners of copyrights in sound recordings the exclusive right "to perform the copyrighted work publicly by means of a digital audio transmission." 17 U.S.C. § 106(6); *accord* Compl. ¶ 1. That right is limited in its scope, however. *See* 17 U.S.C. § 114(d); Compl. ¶¶ 14, 16, 17. For example, radio stations can perform copyrighted sound recordings "publicly by means of a digital audio transmission" if: (1) that "performance is part of . . . a retransmission of a nonsubscription broadcast transmission"; and (2) "the radio station's

_____

[2] In this Report and Recommendation, I use "local" to indicate the geographic area within a 150 mile radius from the site of the station's radio broadcast transmitter. *See* 17 U.S.C. § 114(d)(1)(B)(i). "Simulcast" means to "digitally and simultaneously" retransmit a radio broadcast transmission over the Internet. Compl. Ex. B, at 2, ECF No. 1-2; *accord* Compl. Ex. C, at 2, ECF No. 1-3.

broadcast transmission is not willfully or repeatedly retransmitted more than a radius of 150 miles from the site of the [station's] radio broadcast transmitter." 17 U.S.C. § 114(d)(1)(B)(i); *accord* Compl. ¶¶ 17, 40.

A copyright owner's exclusive right of public performance is not "infringed" as long as the "retransmission of a radio station's broadcast transmission" stays within that 150 mile zone. 17 U.S.C. § 114(d)(1); *accord* Compl. ¶ 17. But once the radio station "willfully or repeatedly" retransmits its broadcast transmissions beyond that boundary, the station must pay for the privilege of performing any copyrighted sound recording that is part of the infringing retransmission. *See* 17 U.S.C. § 114(d)(1)(B)(i), (f)(1)(4)(B); *accord* Compl. ¶¶ 14–18.

Copyright owners also have an exclusive right to authorize another "to reproduce the copyrighted work in copies or phonorecords."[3] 17 U.S.C. § 106(1). A federally licensed radio station that "makes a broadcast transmission of a performance of a sound recording in a digital format on a nonsubscription basis," however, can produce "one copy or phonorecord of a particular transmission program embodying the performance" if the copy or phonorecord: (1) "is retained and used solely by" the station "for [its] own transmissions within its local service area"; and (2) "unless preserved exclusively for archival purposes, . . . is destroyed within six months from the date the transmission program was first transmitted to the public." *Id.* § 112(a)(1), (e)(1). Otherwise, the radio station must pay for the privilege of reproducing a copyrighted sound recording. *See id.* § 112(e).

Royalties can be paid directly to copyright owners under privately negotiated licenses or to a designated collective organization under statutory licenses. *See generally* 17 U.S.C.

---

[3] A "phonorecord" is a "material object[] in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101.

§§ 112(e)(2), 114(f)(3) (private licenses); *id.* §§ 112(e)(1), 114(f)(4)(B) (statutory licenses); 37 C.F.R. §§ 380.1–380.17 (setting the rates and terms for statutory licenses under 17 U.S.C. §§ 112 and 114); *see also* Compl. ¶ 18. "Statutory licensees pay royalties, but [they] do not have to negotiate with individual copyright owners for every recording [that] they want to broadcast." *SoundExchange, Inc. v. Sirius XM Radio, Inc.*, --- F. Supp. 2d ---, 2014 WL 4219591, at *1 (D.D.C. Aug. 26, 2014). "Any person" who wants to reproduce or publicly perform a copyrighted sound recording "under a statutory license . . . may do so without infringing the exclusive right[s] of the copyright owner" under 17 U.S.C. § 106 "by complying with such notice requirements as . . . prescribe[d] by regulation and by paying royalty fees in accordance with [sections 112(e) and 114(f)]." 17 U.S.C. §§ 112(e)(6)(A)(i), 114(f)(4)(B)(i); *accord* 37 C.F.R. § 370.2 (establishing the procedures for filing a "notice of use of sound recording under statutory license").

Defendant SoundExchange is the "sole collective," Compl. ¶ 10, in charge of collecting and distributing royalties due to the owners of copyrights in sound recordings from broadcasters who choose to operate under statutory licenses. *See* C.F.R. §§ 380.4(b), 380.13; *cf. Sirius XM Radio*, 2014 WL 4219591, at *1 ("[R]egulations implementing the Copyright Act charge SoundExchange, an independent non-profit organization, with collecting the performance royalties from statutory license users . . . and distributing those royalties to the copyright owners in accordance with 17 U.S.C. § 114(g)(2)(A)–(D)."). SoundExchange has no apparent authority to compel broadcasters to take statutory licenses,[4] to enforce the terms of privately negotiated

---

[4] The complaint alleges that SoundExchange "administer[s] compulsory licenses in sound recordings," Compl. ¶ 10, which could be understood to imply that broadcasters can be "compelled" to take statutory licenses under 17 U.S.C. §§ 112 and 114. In its brief, SoundExchange explains that a statutory license is "also known as a 'compulsory license' because it cannot be withheld by the copyright owners." Def. Br. in Supp. 3. The Copyright Act's

licenses, or to enforce copyrights generally. *See, e.g.*, 17 U.S.C. § 114(g)(3); 37 C.F.R. § 380.4; Compl. Ex. A, at 2–3 ¶¶ 1, 6, ECF No. 1-1. However, it can sue to collect royalties and other fees if a broadcaster does not comply with the terms of its statutory license. *See, e.g.*, *Sirius XM Radio*, 2014 WL 4219591, at *1–2 (staying SoundExchange's civil action to collect underpaid royalties and unpaid late fees under 37 C.F.R. § 382.13 pending further administrative proceedings).

SoundExchange is a non-profit organization funded by a portion of the royalties that it collects from broadcasters on behalf of copyright owners who register with the organization. *See* 17 U.S.C. § 114(g)(3); Compl. ¶ 21. Copyright owners also can opt-in to SoundExchange's "membership" services by expressly appointing SoundExchange as their "nonexclusive" licensor, collection agency, lobbyist, and law firm. *See generally* Compl. Ex. A, at 2–3 ¶¶ 1, 2, 5, 6. For example, copyright owners who become SoundExchange "Members" contractually authorize the organization:

> to enforce nonexclusively the rights of public performance, communication, and reproduction granted under [statutory licenses defined in 17 U.S.C. §§ 112(e) and 114] with respect to the sound records owned or (controlled by) Member. With Member's consent, Member authorizes SoundExchange in SoundExchange's sole judgment (i) to commence and prosecute litigation, in the name of SoundExchange, Member, or others in whose name the sound recordings owned (or controlled) by Member may be held; (ii) to collect and receive damages arising from infringement of the foregoing rights; (iii) to join Member or others in whose names sound recordings owned (or controlled) by Member may be held as parties plaintiff or defendant in any litigation involving such rights; or (iv) to release, compromise, or refer to arbitration any claims or actions involving

---

plain language supports SoundExchange's explanation. *See* 17 U.S.C. § 114(f)(4)(B)(i), (f)(3); *see also* 37 C.F.R. § 262.2(g)(1); *Webcaster Alliance, Inc. v. Recording Indus. Ass'n of Am., Inc.*, No. C 03-3948 WHA, 2004 WL 1465722, at *1 (N.D. Cal. Apr. 1, 2004) ("The [Digital Millennium Copyright Act of 1998] establishes a statutory right for webcasters to be eligible for a license for copyrighted sound recordings. 17 U.S.C. § 114(d)(2). This license is 'compulsory' as to the copyright holders but 'voluntary' as to the webcasters.").

Case 5:14-cv-00015-MFU-JCH   Document 46   Filed 09/12/14   Page 5 of 27   Pageid#: 428

infringement of such rights, in the same manner and to the same extent as the Member could.

With Member's consent, Member hereby makes, constitutes and appoints SoundExchange or its successor as Member's true and lawful attorney, irrevocably during the term of the Agreement, to do all acts, take all proceedings, and execute, acknowledge and deliver any and all instruments, papers, documents, process and pleadings that may be necessary, proper or expedient to restrain infringements and recover damages relating to the infringement or other violation of such rights and to discontinue, compromise or refer to arbitration any such proceedings or actions, or to make any other disposition of the differences in relation thereto, in the name of SoundExchange or its successor, or in the name of Member or otherwise.

*Id.* at 3 ¶ 6; *see also id.* at 2 ¶ 1. SoundExchange can only collect royalties on performances or reproductions of sound recordings by broadcasters who first elect to operate under the statutory licenses defined in 17 U.S.C. §§ 112 and 114. *See id.* at 2–3 ¶¶ 1, 6. Even then, copyright owners retain broad authority to enforce their rights under 17 U.S.C. § 106 against broadcasters who violate the terms of statutory licenses. *See id.*; *see also* 17 U.S.C. § 114(d)(4).

B.      *The Dispute*

When they filed this suit, WQPO and WJDV paid royalties to SoundExchange under statutory licenses because they simulcast their FM radio programming without geographic restriction. Compl. ¶¶ 7, 8, 25. WTGD did not simulcast its FM radio programming as of April 30, 2014. *Id.* ¶ 6. All three radio stations want to simulcast their FM radio programming exclusively to their local listeners using geo-fencing technology. *Id.* ¶¶ 4, 35, 44.

According to the Complaint, "[g]eo-fencing is a proven technology" used by the gaming industry "to restrict access to online gaming to recipients physically located in jurisdictions where [on-line] gaming is legal." *Id.* ¶ 34. Before filing this lawsuit, Plaintiffs "consulted with geo-fencing experts and service providers." *Id.* ¶ 35. Plaintiffs believe that setting up geo-fenced simulcasts "require[s] a substantial financial investment," *id.* ¶ 49, that "makes sense . . . only if

6

it exempts them from copyright liability and having to pay royalties," Pl. Br. in Opp. 7–8, ECF No. 28.

In a letter dated February 28, 2014, WTGD's attorney advised SoundExchange of WTGD's intent to set up a simulcast that was available exclusively to its local listeners. *See* Compl. ¶¶ 37, 44, 47; Compl. Ex. B, at 2–3. Counsel wrote "that a copyright owner's exclusive performance right is not infringed" when a radio station's "broadcast transmission is retransmitted, digitally and simultaneously, only within a radius of 150 miles or less from the site of the station's radio broadcast transmitter." Compl. Ex. B, at 2. He explained that WTGD intended to use geo-fencing technology to "exclude" access by Internet users located more than 75 miles from its broadcast transmitter, which "would be within the 150 mile exemption." *Id.* Thus, counsel believed that WTGD's simulcasts would "conform to the exemption from the statutory license for sound recordings under [17 U.S.C. § 114(d)(1)(B)(i)], so that it would owe no payments to SoundExchange." *Id.* But WTGD also wanted "to insure [*sic*] that its understanding of the Act [was] correct" and sought "confirmation" from SoundExchange "that WTGD [would] not face a legal challenge to its intended geofenced Internet streaming." *Id.* at 2–3. WTGD noted that it "want[ed] to commence its new Internet streaming in the very near future" and asked SoundExchange to respond by March 14, 2014. *Id.* at 3.

SoundExchange's Senior Counsel for Licensing & Enforcement responded to WTGD's letter on March 14, 2014. *See* Compl. ¶ 38; Compl. Ex. C, at 2. She noted that "SoundExchange [did] not share [WTGD's] view concerning Section 114(d)(1)(B)(i)" because, in SoundExchange's view, the 150 mile exemption "does not apply when broadcasters simulcast their own programming over the internet." Compl. Ex. C, at 2; *see also* Compl. ¶ 38. Counsel also explained that, even "if Section 114(d)(1)(B)(i) *did* apply to WTGD's proposed simulcasting

(which it does not)," WTGD would still need a "statutory mechanism for clearing rights to the reproductions necessary to enable its simulcasts." Compl. Ex. C, at 2.

Thus, SoundExchange "strongly urge[d] WTGD to seek licenses for its simulcasts." *Id.* The letter noted that, "[s]hould WTGD choose to rely on the statutory performance and reproduction licenses that SoundExchange administers," WTGD could submit to the Copyright Office a "Notice of Use of Sound Recordings Under Statutory License," which was available on SoundExchange's website. *Id.* There WTGD could find "further information concerning compliance with the statutory licenses." *Id.*; Compl. ¶ 38. SoundExchange's counsel also offered to make herself available if WTGD's counsel had any questions. *See* Compl. Ex. C, at 2.

Plaintiffs filed this declaratory judgment action against SoundExchange six weeks later. WTGD is concerned that its intended investment in geo-fenced Internet streaming "will be for naught if [it] owes SoundExchange royalties for a live stream of [an] FM broadcast whether or not the live stream is geo-fenced." Compl. ¶ 49. WQPO and WJDV also "fear that SoundExchange will demand royalties" even if they geo-fence their current simulcasts. *Id.* ¶ 50. Plaintiffs ask this Court to "clarify [their] rights and obligations under 17 U.S.C. §§ 112 and 114" before they take the next step towards geo-fencing. *Id.* ¶¶ 52, 35.

SoundExchange moved to dismiss the Complaint under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. SoundExchange argues that this Court lacks subject matter jurisdiction under the Declaratory Judgment Act and personal jurisdiction over it as a non-resident defendant and that the Complaint fails to state a claim for which relief can be granted under the Copyright Act. *See generally* Def. Br. in Supp. 1–2, ECF No. 19; Def. Reply 1–3, ECF No. 29. I held a motions hearing on August 15, 2014. *See* Hr'g Tr. 1–2, ECF No. 45.

## II. Discussion

A defendant can challenge a court's subject matter jurisdiction in "two critically different ways." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *accord Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). First, the defendant can argue that the "complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Kerns*, 585 F.3d at 192. In that situation, the court accepts all well-pleaded factual allegations as true, and the plaintiff is afforded the same procedural protections as under Rule 12(b)(6).[5] *Id.* The court will dismiss an action under Rule 12(b)(1) only when "the complaint and the documents upon which it is based," *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 610 n.3 (D. Md. 2011) (citing *Adams*, 697 F.2d at 1219), do not "plausibly allege" general facts sufficient to invoke the court's authority to resolve the dispute, *Liberty Univ. v. Lew*, 733 F.3d 72, 89, 90 (4th Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) ("[O]n a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.").

Second, the defendant can argue that the jurisdictional facts alleged in the complaint are false. *Kerns*, 585 F.3d at 192. In that situation, the court "regards the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the defendant's motion to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir.

---

[5] In reviewing a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded factual allegations as true and construe those allegations in a light most favorable to the plaintiff. *Hash v. Close*, 968 F. Supp. 2d 825, 828–29 (W.D. Va. 2013) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The court need not accept legal conclusions drawn from those facts, unwarranted inferences, or unreasonable conclusions or arguments. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

9

2004). The court generally is free to weigh that evidence and to resolve factual disputes in order to determine its authority to decide the case. *See Kerns*, 585 F.3d at 192.

SoundExchange's 12(b)(1) motion is a facial challenge to the Complaint. *See Sierra Club v. Kempthorne*, 589 F. Supp. 2d 720, 725 (W.D. Va. 2008) (noting that "the court must initially consider" whether a Rule 12(b)(1) motion presents "a facial challenge or a factual challenge" in order to apply the proper standard of review). Accordingly, I will focus my inquiry on whether the facts alleged in the Complaint and exhibits (ECF Nos. 1 to 1-3) are sufficient to invoke this Court's authority to entertain Plaintiffs' claim for declaratory relief against SoundExchange. *See Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010) (holding that the party seeking to invoke the court's subject matter jurisdiction bears the burden of proving it exists). For the reasons that follow, I respectfully recommend that they are not.

A.    *The Declaratory Judgment Act*

The Declaratory Judgment Act ("DJA") allows a federal court, in "a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The DJA is not an independent source of jurisdiction. *See Skelly Oil Co. v. Phillips Petro. Co.*, 339 U.S. 667, 671–72 (1950). It provides an additional, discretionary remedy in appropriate cases of "actual controversy" where the court has subject matter jurisdiction from some other source. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004).

The phrase "actual controversy" includes any case or controversy over which the court may exercise jurisdiction under Article III of the United States Constitution. *See MedImmune*, 549 U.S. at 127. Article III authorizes federal courts to resolve "definite and concrete," "real and

10

substantial" disputes "touching the legal relations of parties having adverse legal interests" and "admit[ting] of specific relief through a decree of a conclusive character." *Id.* There is no bright-line test for determining whether a particular declaratory judgment action presents a justiciable controversy. *See Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). A court's analysis must take into account the totality of the facts alleged in the complaint. *MedImmune*, 549 U.S. at 127. The court may entertain a declaratory judgment action if the facts alleged, under all circumstances, demonstrate: (1) a substantial controversy; (2) between parties having adverse legal interests; (3) of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Id.*

This standard is similar to the standards used to determine the existence of related, but more specific, elements of Article III's case-or-controversy requirement, such as standing and ripeness. *See Prasco, LLC v. Medicis Pharma. Corp.*, 537 F.3d 1329, 1336 (Fed. Cir. 2008) ("As satisfying these doctrines represents the absolute constitutional minimum for a justiciable controversy, they can be a helpful guide in applying the all-the-circumstances test."); *see also MedImmune*, 549 U.S. at 128 n.8. At bottom, each standard ensures that federal courts respect their "proper—and properly limited—role . . . in [our] democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). For "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Id.*

B.      *Analysis*

This case involves a disagreement over whether sections 112 and 114 of the Copyright Act allow radio stations to retransmit their broadcast transmissions over the Internet exclusively to their local listeners without paying statutory licensing fees or royalties on copyrighted sound recordings that are part of those simulcasts. *See* Compl. ¶¶ 47–48. Plaintiffs allege that their geo-

11

fenced simulcasts will satisfy the statute's criteria for non-infringing performances so that they have no obligation to obtain statutory licenses or pay royalties to SoundExchange. *Id.* ¶¶ 47–48, Compl. Ex. B, at 2–3; *see also* Pl. Br. in Opp. 4. But Plaintiffs are unwilling to invest in geo-fencing until they know that it will "exempt[] them from copyright liability and having to pay royalties." Pl. Br. in Opp. 8; *accord* Compl. ¶¶ 49, 50.

Plaintiffs' counsel solicited SoundExchange's assent that Plaintiffs' "understanding of the [Copyright] Act [was] correct" before they invested in geo-fencing technology. Compl. Ex. B, at 2–3; *see also* Compl. ¶¶ 36–38. Having been informed that SoundExchange "does not share [their] view" of the law, Compl. Ex. C, at 2, Plaintiffs now insist that judicial intervention is necessary to clarify their rights and obligations under sections 112 and 114. Compl. ¶ 52. SoundExchange argues that "the Complaint fails to allege any real and immediate controversy between the parties." Def. Br. in Supp. 6. Indeed, it believes that Plaintiffs allege nothing more than "an illusory dispute" that "does not directly implicate SoundExchange." Def. Br. in Supp. 6–7; *see also id.* at 11. These arguments evoke principles of Article III standing.[6]

Standing concerns whether the proper parties are before the court. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (holding that, even when a plaintiff has been injured, Article III's "'case or controversy' limitation . . . still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court"). To establish standing at the pleading stage, a plaintiff must plausibly allege that: (1) it has suffered an

---

[6] Both parties frame their arguments mostly in terms "ripeness" rather than "standing." *See, e.g.*, Def. Br. in Supp. 8; Def. Reply 4; Compl. ¶¶ 51–52; Pl. Br. in Opp. 3, 5, 6, 7, 9. Ripeness concerns whether a plaintiff properly before the court has filed suit at an appropriate time. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985). Plaintiffs in this case are not properly before the court because a favorable judgment would not redress any injury fairly traceable to SoundExchange's authority to enforce the terms of statutory licenses.

12

injury—*i.e.*, an invasion of a legally protected interest—that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged conduct; and (3) it is likely, as opposed to merely speculative, that the alleged injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560–61; *Liberty Univ.*, 733 F.3d at 89, 90.

In cases involving a threat of future harm, the plaintiff must show that its alleged injury "is certainly impending," and not just the anticipated consequence of its "'some day' intentions." *Lujan*, 504 U.S. at 564, 565 n.2 (emphasis omitted); *Doe v. Obama*, 631 F.3d 157, 163 (4th Cir. 2011) ("[T]he Supreme Court has 'insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all.'" (quoting *Lujan*, 504 U.S. at 565 n.2)). At the pleading stage, a plaintiff can satisfy this requirement by plausibly alleging that it has "some concrete plan" to act in a way that will cause it to suffer harm fairly traceable to the defendant's challenged conduct. *Obama*, 631 F.3d at 163. The facts alleged in this Complaint do not establish that Plaintiffs' fear of future harm is fairly traceable to SoundExchange's challenged conduct or likely to be redressed by the relief Plaintiffs seek from this Court.

1.      *Injury & Causation*

A declaratory-judgment plaintiff is injured when "an assertion of rights by the defendant" forces the plaintiff either to pursue "arguably illegal behavior or abandon[] that which he claims a right to do."*Alpharma, Inc. v. Purdue Pharma., L.P.*, 634 F. Supp. 2d 626, 631 (W.D. Va. 2009) (Jones, J.); *accord MedImmune*, 549 U.S. at 129–31 (collecting cases). "[S]elf-avoidance of imminent injury" alone, *MedImmune*, 549 U.S. at 130, will not defeat standing when the plaintiff's "threat-eliminating behavior [is] effectively coerced" by the defendant's challenged

13

conduct, *id.* at 129. This is an objective standard that cannot be met with allegations of purely subjective or speculative fear of harm. *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013).

In this case, Plaintiffs claim a right to simulcast their radio programming exclusively to local listeners without obtaining statutory licenses or paying royalties to SoundExchange. *See* Compl. ¶¶ 47–50; Compl. Ex. B, at 2. Plaintiffs believe that geo-fencing "is so costly to adopt that it makes sense to do so only if it exempts them from copyright liability and having to pay royalties." Pl. Br. in Opp. 7–8. Thus, "they are unwilling to take that last, expensive step while SoundExchange posits that it will have no impact on the royalties they owe." *Id.* at 7; *accord* Compl. ¶¶ 49, 50.

SoundExchange argues that Plaintiffs' alleged injury is hypothetical because they have not implemented the geo-fencing technology, and, thus, whether the technology would work remains "fluid and indeterminate." *See* Def. Br. in Supp. 8–10 (citing *Alpharma*, 634 F. Supp. 2d at 631–32). Specifically, SoundExchange argues that the Plaintiffs cannot show that the technology will effectively contain their local Internet retransmissions so that they are not "'willfully or repeatedly retransmitted'" beyond 150 miles. *Id.* at 10 (quoting 17 U.S.C. § 114(d)(1)(B)(i)).

Plaintiffs respond that their dispute with SoundExchange is "no less immediate because [they] have not yet installed geo-fencing technology" because they need not "bet the farm" to sustain a declaratory judgment action. Pl. Br. in Opp. 7 (citing *MedImmune*, 549 U.S. at 134). Rather, it is enough that they are "'simply not doing what [they] claim a right to do'" because their "'threat-eliminating behavior is effectively coerced'" by SoundExchange's interpretation of the Copyright Act. *Id.* (quoting *MedImmune*, 549 U.S. at 129).

14

This is indeed "a legal dispute" about whether a statute, by its terms, applies to radio broadcast transmissions retransmitted over the Internet exclusively to a radio station's local listeners. Pl. Br. in Opp. 8. Plaintiffs allege that their geo-fenced simulcasts will satisfy the statute's criteria for non-infringing unlicensed performances. Compl. ¶¶ 47–48. SoundExchange "does not share [Plaintiffs'] view" of the law and has "strongly urge[d] WTGD to seek licenses for its simulcasts." Compl. Ex. C, at 2. On a motion to dismiss, the court must accept that Plaintiffs, as is alleged, intend to install a technology that could plausibly keep their simulcasts within a 150 mile virtual boundary. *See Liberty Univ.*, 733 F.3d at 90. Plaintiffs allege that the on-line gaming industry uses geo-fencing technology to exclude access to data by users who are not "physically located in [states] where [on-line] gaming is legal." Compl. ¶ 34. It is plausible that a radio station could use the same technology to exclude access to simulcasts by users who are not physically located within 150 miles of the station's radio broadcast transmitter. *See id.* ¶¶ 30–34. Plaintiffs "need not go through the motions" to complete this project if it would sharpen the legal questions involved. *Harris v. McDonnell*, 988 F. Supp. 2d 603, 612–13 (W.D. Va. 2013) (Urbanski, J.) ("Having been informed by [the defendant] that same-sex couples may not marry in Virginia, [plaintiffs] need not go through the motions of completing and tendering a license application to challenge the same-sex marriage ban. 'The law does not require such a futile act'" (quoting *Townes v. Jarvis*, 577 F.3d 543, 547 n.1 (4th Cir. 2009))).

That said, the purely voluntary cost of setting up a geo-fenced simulcast is not a cognizable injury, much less one fairly traceable to SoundExchange's interpretation of sections 112 and 114. *Cf. Clapper v. Amnesty Int'l USA*, --- U.S. --- 133 S.Ct. 1138, 1155 (2013) (holding that plaintiffs "cannot manufacture standing by [voluntarily] incurring costs in anticipation of non-imminent harm"); *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) ("[A] possible

15

financial loss is not by itself a sufficient interest to sustain a judicial challenge to a governmental action."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

The cognizable injury Plaintiffs seek to avoid through this action is the fear of incurring liability for infringing copyright owners' rights of public performance and reproduction if they simulcast exclusively to their local listeners without first obtaining statutory licenses. *See, e.g.*, Compl. ¶¶ 18, 38, 47–48; Compl. Ex. B, at 2–3; Pl. Br. in Opp. 7–8. The Complaint plausibly alleges that Plaintiffs "have some concrete plan," *Obama*, 631 F.3d at 163, for "pursuing [this] arguably illegal behavior," *Alpharma*, 634 F. Supp. 2d at 631, in the very near future. *See* Compl. ¶ 35; Compl. Ex. B, at 2–3. It also plausibly alleges that "without a declaration of [their] rights" under sections 112 and 114, Plaintiffs "will continue to operate on legally uncertain grounds," *Alpharma*, 634 F. Supp. 2d at 631. *See* Compl. ¶¶ 47–48. The Complaint, however, does not plausibly allege that "an assertion of rights *by the defendant*" put Plaintiffs in this position. *Alpharma*, 634 F. Supp. 2d at 631. (emphasis added).

According to Plaintiffs, SoundExchange's counsel "strongly urge[d] Plaintiffs to abandon geo-fencing, enter into statutory licenses, and pay royalties." Pl. Br. in Opp. 6; *accord* Compl. ¶¶ 5, 47, 48, 51 (alleging that counsel insisted that Plaintiffs accept statutory licenses and pay royalties to SoundExchange). Thus, Plaintiffs argue that SoundExchange's "letter left [them] with an impossible choice[:] They could either abandon their rights under the exemption and pay SoundExchange or expend significant resources to geo-fence webcasts that SoundExchange contends would be infringing." Pl. Br. in Opp. 3; *accord* Compl. ¶¶ 47–48. This argument distorts the substance of SoundExchange's letter.

In its letter to SoundExchange, WTGD explained that it believed a local simulcast would not infringe a copyright owner's exclusive performance right and would be exempt from the

Case 5:14-cv-00015-MFU-JCH   Document 46   Filed 09/12/14   Page 16 of 27   Pageid#: 439

statutory license. SoundExchange responded that it disagreed with WTGD's interpretation of the 150 mile exemption. SoundExchange did not take a position on whether Plaintiffs should pursue geo-fencing, instruct Plaintiffs to seek *statutory* licenses (as opposed to private licenses) for their planned simulcasts, insist that Plaintiffs pay royalties *to SoundExchange* (as opposed to individual copyright owners) on geo-fenced simulcasts, suggest that Plaintiffs' planned simulcasts would "infringe" copyright owners' rights "unless Plaintiffs accept the statutory license and pay it royalties pursuant to" 17 U.S.C. §§ 112(e) and 114(f), or threaten legal action against Plaintiffs if they ran a geo-fenced simulcast but chose *not* "to rely on the statutory performance and reproduction licenses that SoundExchange administers." Compl. ¶¶ 47–48; Compl. Ex. C, at 2. *Cf. Prasco,* 537 F.3d at 1340–41 (finding that the plaintiff lacked Article III standing to bring declaratory judgment action against potential competitors where the complaint did not allege that the competitors took any "affirmative actions at all related to" the plaintiff's plan to bring its product to market, let alone that the competitors "believe[d] or plan[ned] to assert that the plaintiff's product infringes their patents").

At most, SoundExchange failed "to give assurances," *Prasco*, 537 F.3d at 1341, that WTGD would "not face a legal challenge," Compl. Ex. B, at 3, to its planned simulcasts. *See* Compl. Ex. C, at 2. While this is "one circumstance to consider in evaluating the totality of the circumstances" under *MedImmune*, "it is not sufficient to create an actual controversy—some affirmative action[] by the defendant will also generally be necessary."[7] *Prasco*, 537 F.3d at

---

[7] Article III does not require Plaintiffs to allege that SoundExchange expressly or implicitly threatened to bring legal action. *See, e.g.*, *MedImmune*, 549 U.S. at 132 n. 11 (rejecting "the reasonable-apprehension-of-suit test" in declaratory judgment actions); *Alpharma*, 634 F. Supp. 2d at 631. Nonetheless, SoundExchange's failure to threaten legal action against Plaintiffs in particular, and its lack of litigious conduct in general, *see* Def. Br. in Supp. 12–13; Def. Reply 7, weigh against finding that this dispute presents "a substantial controversy, between parties having adverse legal interests, of *sufficient immediacy and reality* to warrant the issuance of a

Case 5:14-cv-00015-MFU-JCH   Document 46   Filed 09/12/14   Page 17 of 27   Pageid#: 440

1341. The Complaint contains no well-pleaded facts from which this Court could reasonably infer that Plaintiffs' unwillingness to forge ahead with their project "was effectively coerced," *MedImmune*, 549 U.S. at 129, by SoundExchange's noncommittal response to WTGD's unsolicited attempt to "avoid any misunderstandings [that] could lead to unnecessary litigation," Compl. Ex. B, at 2–3.

Plaintiffs argue that this dispute nonetheless "touch[es] the legal interests of the parties" because SoundExchange's lawyer responded to WTGD's letter. Pl. Br. in Opp. 6 (quoting *Alpharma,* 634 F. Supp. 2d at 630). They rely on Judge Jones's finding in *Alpharma* that "[t]here would be no need for the lawyers to confer if the defendant did not believe that th[eir] difference in opinion did not touch the legal interests of the parties." *Id.* The substance of SoundExchange's response to WTGD's unsolicited letter did not put these parties' disagreement on the same legal footing as the competing pharmaceutical companies' dispute in *Alpharma*.

The parties in *Alpharma* met several times over the course of two years without their attorneys to negotiate a "mutually beneficial business arrangement" for developing and selling an abuse-resistant drug. *See* 634 F. Supp. 2d at 628. At one meeting, Purdue's representative commented that Alpharma's representatives "must be aware of [Purdue's] extensive intellectual property rights in the field of abuse-resistant opioid formulations." *Id.* (internal alterations omitted). Alpharma's representative responded that it "was aware of [Purdue's] patents, but that based on [Alpharma's] internal analysis of those patents, it believed [that] it had the freedom to practice in this area." *Id.*

---

declaratory judgment." *MedImmune*, 549 U.S. at 127 (emphasis added); *accord Prasco*, 537 F.3d at 1339–41 (finding that "one prior suit concerning different products covered by different patents is not the type of prior conduct that makes reasonable an assumption that Medicis will also take action against Prasco regarding its new product").

18

One of Purdue's officers said that it was "his company's position that its patents were broad enough to encompass" Alpharma's new abuse-resistant formula, "and that it would be necessary to let the lawyers work [out] the dispute[.]" *Id.* (internal alterations and quotation marks omitted). In a follow-up e-mail, Purdue "offered to arrange for its VP and Chief IP Counsel to be available to [Alpharma's] patent counsel if it would be helpful to [Alpharma's] understanding of [Purdue's] intellectual property." *Id.* Alpharma forged ahead without Purdue's collaboration. *See id.* at 629. By the time it filed suit, Alpharma had invested $40 million in its drug and was waiting for the Federal Drug Administration's inevitable stamp of approval. *See id.*

Judge Jones found that this particular exchange, especially Purdue's comment "that it would be necessary to let the lawyers work [out] the dispute," evidenced a definite and concrete controversy between parties having adverse legal interests. *Id.* at 630. In that case, Purdue's "assertion of rights" over Alpharma's new formula forced Alpharma to either "continue to produce a drug that [was] potentially encompassed by the defendant's patents or reluctantly forgo the drug's development." *Id.* at 631. That dispute was "justiciable because without a declaration of its rights," Alpharma would "continue to operate on legally uncertain grounds." *Id.* Judge Jones noted that Alpharma's "uncertainty [was] all the more reasonable in light of [Purdue's] aggressive litigation strategy in similar cases." *Id.*

Unlike in the parties in *Alpharma*, SoundExchange did not have any contact with WTGD before it received WTGD's attorney's unsolicited letter. Def. Br. in Supp. 12. Nor does SoundExchange's letter contain "an assertion of rights by the defendant," much less one that objectively put Plaintiffs "in a position of either pursuing arguably illegal behavior or abandoning that which [they] claim[] a right to do." *Id.* Plaintiffs cite no authority, and I can find none, suggesting that one attorney merely identifying her disagreement with another attorney's

19

interpretation of a statute can create a justiciable controversy between named parties.[8] *Cf. Hewlett-Packard v. Acceleron LLC*, 587 F.3d 1358, 1362 (Fed. Cir. 2009) (holding that a communication from the defendant, a patent owner, to the plaintiff, a competitor, "merely identifying [defendant's] patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute"). It would be far too easy to manufacture Article III standing if that were the rule.

    2.    *Redressability*

     Plaintiffs' biggest obstacle to establishing Article III standing in this case is that their injury—uncertainty as to whether they will incur copyright liability if they simulcast exclusively to local listeners without first obtaining statutory licenses—is not traceable to SoundExchange's designation as the music industry's "'sole collective' for collecting and distributing royalties due to copyright owners" under statutory licenses. Compl. ¶ 10. Rather, that injury is inextricably

---

[8] Indeed, but for SoundExchange's response to WTGD's letter, the material facts in this case would be indistinguishable from those in *Prasco*. There, the plaintiff filed a declaratory judgment action against potential competitors who "did not know about" plaintiff's product until the complaint was served. 537 F.3d at 1334. After defendants filed their motion to dismiss, Prasco sent Medicis a product sample and "requested a covenant not to sue under" four of Medicis's patents. *Id.* Defendants did not sign the agreement, instead informing Prasco that they "d[id] not intend to withdraw [their] motion to dismiss the complaint." *Id.* The *Prasco* panel held that, under *MedImmune*'s totality-of-the-circumstances test, Medicis's "refusal to give assurances" was "not sufficient to create an actual controversy" between the parties. *Id.* at 1341. There was no evidence that Medicis had "taken [any] affirmative action[] at all related to Prasco's" planned product, much less "a concrete position adverse to Prasco's" allegation "that its product does not infringe [Medicis's] patents." *Id.* at 1340.

In this case, the Complaint does not plausibly allege that SoundExchange took any "affirmative action[] at all related to" Plaintiffs' plan, much less that SoundExchange's response, considering the contents of the letter, made a "concrete claim of a specific right" adverse to Plaintiffs' rights. *Prasco*, 537 F.3d at 1340. As in *Prasco*, SoundExchange's failure to assure WTGD that it "will not face a legal challenge" if it runs geo-fenced simulcasts without obtaining a statutory license simply is not enough to create a justiciable controversy between these parties.

linked to each copyright owner's "exclusive rights" of public performance and reproduction that are protected under the Copyright Act. *See* 17 U.S.C. §§ 106, 114(d)(4).

SoundExchange has no inherent authority to enforce the "exclusive rights" defined in 17 U.S.C. § 106, because it is not the "owner of a copyright" under that title. *See* Def. Reply 7. The organization collects licensing fees and royalties from broadcasters who choose to "rel[y] upon the statutory licenses set forth in 17 U.S.C. 112(e) and 114." 37 C.F.R. § 380.10(b); *accord Sirius XM Radio*, 2014 WL 4219591, at *1. It then distributes those payments to copyright owners who choose to register with the organization. *See* 17 U.S.C. § 114(g)(3); Compl. Ex. A, at 2. If a copyright owner expressly agrees, SoundExchange can nonexclusively enforce the owner's underlying rights against broadcasters who violate the terms of their statutory licenses.[9] *Id.* at 2–3 ¶¶ 1, 6. Even then, copyright owners retain broad authority to enforce their own rights against "nonexempt" performances and reproductions under sections 106, 112, and 114. *See id.*; *see also* 17 U.S.C. § 114(d)(4) (noting the enforcement rights "not otherwise limited" by section 114). Copyright owners, not SoundExchange, are entitled to compensation for infringement of their copyrights. *See, e.g.*, 17 U.S.C. §§ 112(e)(2), 112(e)(6)(A), 114(d)(4)(C), 114(f)(3), 114(f)(4)(B), 114(g)(3).

"An injury sufficient to meet the causation and redressability elements of the standing inquiry must result from the actions of the respondent, not from the actions of a third party beyond the Court's control." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013). Furthermore, in declaratory judgment actions, the judgment itself "cannot be the redress that satisfies the third standing prong. Plaintiffs must identify some further concrete relief that will likely result from" a favorable declaration of rights. *Comite de Apoyo a los Trabajadores*

---

[9] SoundExchange avers that it "has never sued anyone for copyright infringement." Def. Reply 7 (emphasis omitted).

*Agricolas v. U.S. Dep't of Labor*, 995 F.2d 510, 513 (4th Cir. 1993). The further concrete relief must "significantly affect" or be "likely" to alleviate the particular injury alleged. *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99, 100–01 (collecting cases).

Plaintiffs interpret § 114(d)(1) to exempt their local simulcasts not only from the statutory license administered by SoundExchange, but more broadly from the exclusive rights copyright owners have in their sound recordings granted by 17 U.S.C. § 106(6). *See* 17 U.S.C. § 114(d)(1). Under this interpretation, the Plaintiffs ask this Court to declare that they "need no statutory license under 17 U.S.C. [§§ 112(a) or 114(f)], and thus need make no royalty payments to SoundExchange," in order to simulcast their FM broadcasts exclusively to their local listeners. Compl. 13 ¶¶ 3, 5. They also seek a judgment declaring that an exclusively local simulcast: (1) "is an exempt transmission or retransmission under 17 U.S.C. § 114(d)(1)(B)(i)"; (2) "is not an infringement of any right protected by the Copyright Act"; and (3) "requires no more than one copy or phonorecord of a particular transmission program embodying a performance of a sound recording under 17 U.S.C. § 112(a)." Compl. 13 ¶¶ 1, 2, 4. A favorable judgment on these issues likely would alleviate Plaintiffs' concerns about copyright liability, but it would not redress any injury fairly traceable to SoundExchange.

SoundExchange does not own or enforce copyrights. Moreover, no evidence exists that SoundExchange has the authority to bring an action to compel a broadcaster to obtain a statutory license when the broadcaster has chosen not to obtain one. *See Webcaster Alliance, Inc. v. Recording Indus. Ass'n of Am., Inc.*, No. C 03-3948 WHA, 2004 WL 1465722, at *1 (N.D. Cal. Apr. 1, 2004) ("The [Digital Millennium Copyright Act of 1998] establishes a statutory right for webcasters to be eligible for a license for copyrighted sound recordings. 17 U.S.C. § 114(d)(2). This license is 'compulsory' as to the copyright holders but 'voluntary' as to the webcasters.").

SoundExchange's enforcement authority is limited to enforcing, non-exclusively, statutory licenses once a broadcaster gives notice of its intent to operate under that license. *See, e.g.*, 17 U.S.C. §§ 112(e)(6)(A)(i), 114(f)(4)(B)(i); 37 C.F.R. § 380.4; Compl. Ex. A, at 2–3 ¶¶ 1, 6. If a broadcaster chooses not to obtain a statutory license and broadcast anyway, as the Plaintiffs seek this Court's approval to do, SoundExchange has no role in the matter. Any dispute that may arise in that scenario is between the copyright owner and the broadcaster. Thus, the copyright owners themselves, who are "not party to this litigation[,] must act" (or not act, as the case may be) in order for this particular injury to be cured. *Va. Dep't of State Police*, 713 F.3d at 755.

Plaintiffs argue that a declaratory judgment against SoundExchange in this case "can have a wide effect" because "SoundExchange is in privity with copyholders." Pl. Br. in Opp. 4. Plaintiffs' reference to "privity" presumably means that they would invoke the doctrine of *res judicata* if they were later sued by the nonparty copyright owners. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 894 n.8 (2008) (discussing the meaning of privity in the context of nonparty preclusion); *Martin v. Am. Bancorp. Retirement Plan*, 407 F.3d 643, 651 (4th Cir. 2005) (same).

"Res judicata (or claim preclusion) precludes the assertion of a claim after a judgment on the merits in a prior suit by the parties or their privies based on the same cause of action." *Martin*, 407 F.3d at 650. When wielded against nonparties, *res judicata* "runs up against the deep-rooted historic tradition that everyone should have his own day in court" because a "person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." *Taylor*, 553 U.S. at 892. Thus, it is an affirmative defense requiring a defendant in future lawsuits to "plead and prove" the existence of a discrete, limited exception to the rule against nonparty preclusion. *Id.* at 898, 907.

Case 5:14-cv-00015-MFU-JCH   Document 46   Filed 09/12/14   Page 23 of 27   Pageid#: 446

If Plaintiffs were sued by an individual copyright owner despite obtaining a favorable declaratory judgment in this case, they would likely have to persuade the next district court that the plaintiff copyright holder "was adequately represented by someone with the same interests who was party" to this lawsuit. *Id.* at 894. "A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900. Under Fourth Circuit precedent, the radio stations would have to show that the owner and SoundExchange "represent[] precisely the same legal right in respect to the subject matter involved" in this case. *Martin*, 407 F.3d at 651.

This Court can only speculate as to the likelihood that declaratory relief against SoundExchange would bind nonparty copyright owners. First, it is unreasonable to infer from this Complaint that SoundExchange "is in privity with" *all* copyright owners. At most, SoundExchange could "adequately" represent only those owners who expressly authorized the organization to "enforce nonexclusively" their rights against broadcasters who violate the terms of statutory licenses. Compl. Ex. A, at 2–3 ¶¶ 1, 6. The Complaint does not allege any facts from which I can infer how many owners choose to give SoundExchange this authority. Even if it did, SoundExchange would have no authority at all over the radio stations unless they first elected to operate under the statutory licenses that SoundExchange administers. A judgment in Plaintiffs' favor in this case would eliminate that necessary first step of obtaining statutory licenses. Compl. 13 ¶¶ 3, 5.

Second, and most importantly, this Court cannot decide whether Plaintiffs could invoke claim preclusion in future lawsuits. *See Smith v. Bayer Corp.*, --- U.S. ---, 131 S.Ct. 2368, 2375

(2011) (quoting 18 C. Wright, A. Miller & E. Copper, Fed. Prac. and Proc. § 4405, p. 82 (2d ed. 2002) ("'[A] court does not usually get to dictate to other courts the preclusion consequences of its own judgment.'"). Claim preclusion is an affirmative defense, so "[d]eciding whether and how prior litigation has preclusive effect is usually the bailiwick of the *second* court." *Id.* This Court can neither predict nor control how other judges might rule were Plaintiffs to raise this defense in future litigation. *Cf. Va. Dep't of State Police*, 713 F.3d at 758 (finding that alleged deprivations of a violent sex offender's constitutional rights were not likely to be redressed by a favorable judgment in federal court where plaintiff would still need to petition a state court for relief). Thus, a favorable judgment on any of Plaintiffs' claims against SoundExchange alone would leave Plaintiffs in exactly the same legally uncertain position as they are in today. *Cf. Southern Walk at Broadlands Homeowners Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013) (finding that the plaintiffs could not show "redressability" because they would be injured "*regardless* of the outcome" in their declaratory judgment action).

Federal courts can "act only to redress injur[ies] that fairly can be traced to the challenged action of the defendant, and not injur[ies] that result[] from the independent action of some party not before the court." *Simon*, 426 U.S. at 41–42. The Complaint plausibly alleges that Plaintiffs will "continue to operate on legally uncertain grounds" without a declaration of their rights under sections 112 and 114 of the Copyright Act. *Alpharma*, 634 F. Supp. 2d at 631. It does not allege facts from which the court reasonably can infer that SoundExchange objectively caused Plaintiffs' uncertainty. Rather, Plaintiffs' injury is inextricably linked to individual copyright owners' authority to enforce their intellectual property rights under sections 106, 112, and 114 of the Copyright Act. But those individuals are not before the Court in this action.

### III. Conclusion

Plaintiffs' desire to know whether geo-fencing their simulcasts might protect them from copyright liability is understandable. However, I respectfully recommend that were the district court to reach the merits of that question, it could only issue an opinion advising what the law would be if Plaintiffs sued the copyright owners themselves. This Article III forbids. Therefore, I recommend that the presiding district judge grant SoundExchange's motion and dismiss this action without prejudice, *see Southern Walk*, 713 F.3d at 185, under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTER: September 12, 2014

26

Joel C. Hoppe
United States Magistrate Judge

27